**UNITED STATES of America**

v.

**Michael PATERNO et al., Defendants.**

**No. 73 Cr. 419.**

United States District Court,
S. D. New York.

April 10, 1974.

---

Lawrence Silverman, Asst. U. S. Atty., Organized Crime and Racketeering Section, for the U. S.

Gilbert S. Rosenthal, New York City, for defendant George Denti.

Jos. E. Brill, New York City, for defendant Michael Paterno.

## MEMORANDUM ON SENTENCING

FRANKEL, District Judge.

The two defendants have come on for sentencing upon a jury's solidly grounded verdict finding them guilty of cheating on taxes in substantial amounts over a period of years.

The defendants have lived to middle age with unblemished—indeed, highly respectable—reputations. They have been industrious. They have employed their business and professional skills for socially constructive ends. They were endowed with above average talents for the acquisition of money. Their community has rewarded them with esteem and with material blessings considerably more lavish than those fated for the common run. Nevertheless, though they were surely not driven to crime by the goads of want, these defendants found it agreeable to engage, over at least several years, in a knowing, wilful, blatant scheme to defraud their fellow citizens by defrauding the Treasury of the United States.

This is, in short, a species of criminal case sorrowfully familiar to everyone.

The sad question now, acknowledging our imperfect understanding and our still primitive instruments of criminal justice, has been the determination of a just sentence. Justice is owed, certainly, to the defendants themselves. We are not permitted, however, to overlook that the community for which the judge is commissioned to speak ultimately decides and demands and is owed justice too.

We start, if only fleetingly, with the sentencing provisions of the laws defendants have violated. Defendant Michael Paterno has been convicted on eight counts carrying, in literal but fantastic terms, total sentences of 34 years' imprisonment and $65,000 in fines. The comparably astronomic numbers for defendant George Denti are 28 years and $55,000. Paterno's corporation has also been convicted, and it faces theoretical fines totaling $50,000. Although our newspapers delight in publishing numbers like these, nobody supposes seriously that cumulative sentences remotely approaching them will actually be imposed.

The largest single question, faced at the threshold, is whether the individual defendants are to be imprisoned at all. Judges, armed with too much discretion in such matters, are sharply divided on this question. Many eschew prison sen-

tences in such cases as unnecessary and cruelly retributive. Others, in seemingly growing numbers, recoil from the evident premise that "respectable" criminals—who have lived seemingly ordered lives, well groomed and well spoken, so much like ourselves after all—should be immunized for all that against the law's harsher sanctions.

The arguments against imprisonment cover a familiar gamut and include, at this particular time in our history, a special, if passing, supplement. The latter, to dispose of it first, runs this way: How can we condemn and imprison relatively obscure men for mere fraud upon their government when so many near the pinnacles of power have been discovered lately perjuring themselves, obstructing justice, burglarizing, spying, criminally giving and receiving forbidden monies for campaign uses, taking bribes, and otherwise betraying their trust? The question is not frivolous. But it has—it must have while we survive as what we mean to be—a clear answer.

We are, for much more than a slogan, a government "of the people." We are not led by any permanent or sacred aristocracy, anointed to do its will and pronounce our standards, good or evil, from on high. To be sure, we look for leadership to those we select. But we select them. And in the end it is we who govern them, not they who govern us. The Supreme Court recalled a while ago, and we do well never to forget, two bedrock propositions as James Madison declared them for us:

"The people, not the government, possess the absolute sovereignty."

\* \* \* \* \* \*

"If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people."[1]

It follows that the missteps of people in power are no excuse, and should be no cause, for our breaking faith with ourselves. Wrongdoers in high places and low must be brought to justice. Whether or not that ideal is always achieved, our standards of law and morality are rooted in the people. If the poet may be paraphrased without disrespect, it is to ourselves, not the occasionally fallen star, that we must look for the preservation and steady renewal of our deepest values.

We come, then, to the more familiar appeals for leniency in cases like those here considered. The defendants, as has been mentioned, have led exemplary lives —at least so far as anyone knew until now. They have built stable families and a stable business. People of distinction and more humble workers in their enterprise write letters of sincere praise, devotion, and appreciation on their behalf. The defendants have not been ungenerous in dealing with friends, employees, family members, and charitable agencies. It may be predicted with reasonable confidence that neither defendant will ever run afoul of the law again. The fall from untarnished eminence in their communities has been an irreparably grievous blow. The defendants, in the frequently heard but still pertinent appeal, "have been punished enough already." It is urged earnestly that a sentence of imprisonment would serve ends only of vengeance.

These arguments, however familiar, have been weighed solemnly and attentively, as they deserve to be. But they are outweighed finally by the compelling premise that crimes of greed may be deterred in some measure only if the law's sanctions are seen to be genuine. It must be acknowledged that our belief in the possibility of general deterrence is far from a certainty.[2] The fact remains that this objective—the hope of discouraging others from criminal behavior by announcing credible threats of punishment—remains among the few widely accepted justifications for sending peo-

---

1. New York Times Co. v. Sullivan, 376 U.S. 254, 274, 275, 84 S.Ct. 710, 723, 11 L.Ed.2d 686 (1964).

2. For a sensitive and enlightening appraisal of the subject, including the array of unresolved doubts, see F. Zimring and G. Hawkins, Deterrence (1973).

ple to prison. The consensus tends to be especially strong with respect to deliberate, calculated crimes prompted by avarice. Common experience and introspective reports, from judges among others, support the view that the taxpayer may be expected in at least many cases to weigh the joys of freedom in the early springtime against the financial rewards of deceiving the tax collector. So-called crimes of passion are different, of course, and raise problems of different orders.

Thus, our acceptance of the prediction that the specific defendants here involved have "learned their lesson" is not enough to eliminate altogether the penalty of imprisonment contemplated and authorized by Congress. But it does not follow that the terms should be long ones. The defendants are in the eyes of the law first offenders. First offenders of all kinds, from the ghetto or anywhere else, are always serious candidates for non-custodial sentences. If, as the court holds, the goal of general deterrence plays a large role here, it is a goal served by a sentence sufficient to be painful without being savage. It is pertinent to opine that the vision of closed penitentiary gates and cell doors for periods of months rather than years should be horror enough for the people at whom this deterrent message is aimed.

The point is a suitable one at which to note some of the excessively simpleminded things heard these days about distinctions between "white collar" and "ghetto" offenders. The danger of unfair discrimination is real, as this opinion has already noted. On the other hand, the subject is not usefully or justly treated by hasty sloganeering. It is not nearly fair to compare the businessman sent away for six months with the burglar given five years and to decide instantly that this exposes the venom of race or class or other outrageous prejudice. That prejudice too often exists is a matter not to be doubted. But the bare facts of the suggested contrast are scarcely enough to demonstrate it. A

sentence for a crime ought to reflect a compendious judgment. Is the businessman a first offender and the burglar a fifth? Is the defendant dangerous—i. e., likely to repeat? Is there need and hope of rehabilitation? How frightening to the community is the particular crime? Such questions only suggest the range of proper inquiry before the court may pronounce judgment or that judgment may in turn be judged. Easy slogans and labels disserve the cause of understanding and fairness.

In the specific cases before us, the court has sought to reckon with every relevant circumstance. The defendants have been considered separately and together. The court has reviewed their evidently deep family commitments and the inevitably tragic impact of a prison sentence upon the innocent people who love and need the defendant. Attention has been paid to questions of health, of relative culpability, of seeming shares in illicit gains. An effort has been made, but without success, to divine mitigating factors explaining or in some measure lessening the enormity of the offenses. Defendants' crimes involved a calculated course of fraud extending over a period of years and involving substantial sums of money. In the final analysis, the case seems to be one of undiluted cupidity, not rendered more appealing by the bizarre theories of factual "explanation" defendants evidently gave to their counsel in attempts to obscure the brutal truths from court and jury.

Weighing all the facts together, the court has concluded that sentences must be imposed as follows:

(1) Michael Paterno, on each of Counts 1–8, a sentence of nine months in prison, the prison sentences to run concurrently. In addition, on each of said eight counts a fine of $2,500, to be cumulated, for a total fine of $20,000.

(2) For George Denti, a similar prison sentence—namely, on each of Counts 1–5 and 9, a sentence of nine months in prison to run concurrently. In addition, on each of Counts 1–5, a fine of $2,000,

to be cumulated, for a total fine of $10,000.

(3) For defendant corporation, Paterno & Sons, Inc., on each of Counts 1–5, a fine of $5,000, to be cumulated, for a total fine of $25,000.