**UNITED STATES of America,
Plaintiff,**

v.

**Craig Allen BRAUN, Defendant.**

**No. 74 Cr. 389.**

United States District Court,
S. D. New York.

Sept. 12, 1974.

———◆———

Edward J. Daus, New York City, for defendant.

Paul J. Curran, U. S. Atty., John J. Kenney, Asst. U. S. Atty., for plaintiff.

## MEMORANDUM ON RECONSIDERATION OF SENTENCE

FRANKEL, District Judge.

On September 4, 1974, the defendant in this case, a young, perhaps excessively ambitious businessman, was sentenced to a relatively short term of imprisonment for attempted tax evasion. Four days later, on Sunday, September 8, 1974, the 38th President of the United States granted "a full, free, and absolute pardon unto" the 37th President of the United States "for all offenses against the United States which he, Richard Nixon, has committed or may have committed or taken part in during the period from January 20, 1969, through August 9, 1974." The court has been driven to consider whether these events may be thought to have any meaningful relationship to each other.

The defendant before us, who has moved for a reduction of sentence, is a man of 35. He has no prior criminal record. He is talented, gainfully employed, earnest in the discharge of family obligations, and entitled to hope for a bright, if unsung future. He needs no "rehabilitation" our prisons can offer. The likelihood that he will transgress again is as close to nil as we are ever able to predict. Vengeance, the greatest texts tell us, is not for mortal judges. Why, then, should such a man be sentenced to imprisonment at all?

That question, always the hardest at the time of sentencing, was not made easier by the fact that the crime in question (to which this defendant made a full public confession of guilt without a trial) occurred over six years ago. The court is told—and knows in any event—that the defendant has suffered terribly in the intervening years of investigation, uncertainty, legitimate efforts to avoid indictment, the awful decision to plead guilty, and the tortured wait for the day of sentence. This particular defendant, we learned on impressive professional opinion, has experienced some unique agonies under the

emotional stress of criminal prosecution. "The defendant has suffered enough already" is a familiar refrain to sentencing judges. But the familiar is not necessarily contemptible. The refrain tells a true and moving story. Prison sentences are imposed in spite of it, for presumably weightier reasons, not because the griefs of a convicted defendant before sentence are unreal or trivial.

Why, indeed, then, a prison term for the defendant before us? The grounds, for better or worse, may be recalled briefly: First, *general deterrence*, to make good the law's threats in the hope or belief that others will be discouraged from evading their taxes by the force of this example among many others. Second, *denunciation*, the recording of society's outraged disapproval in a case so serious that, in the words of a classic statement, a lesser penalty would "depreciate the seriousness of the defendant's crime."[1] Third, the demands of *equal justice;* increasingly, the courts recognize that "respectable" or so-called "white-collar" crimes must not be treated with benign understanding while our less privileged (and more driven) criminals serve long terms of imprisonment.[2]

But how do we reconcile the application of these factors to our unknown defendant with the pardon granted last Sunday? In the case at bar, the defendant's crime may have involved as much as $22,000 or as little as $2,500 in evaded taxes. The alleged crimes embraced by the recent pardon may have included among the lesser items tax evasion to the extent of several hundreds of thousands of dollars. This was, of course, a matter of relative insignificance in the course of conduct for which impeachment had been recommended. Comparison of the cases in terms of what might "depreciate the seriousness" of the crimes would, obviously, be ludicrous. And whatever is meant when we say comparisons are "odious," comparisons are the daily essence of our efforts to be fair and just.

As for "deterrence," the cases of the former President and of our defendant are different, to be sure, but scarcely in any way that makes it comfortable to be harsher here. We are entitled to hope that motivations loftier than the threat of prison will prompt our Presidents to execute the laws faithfully, to promote rather than obstruct justice, and to pay their taxes. But it remains a source of queasiness to realize that deterrence means "making examples" of people (despite the moral and philosophic questions that raises); that our relatively anonymous defendant adds at most to a mass of indistinguishable examples; and that the alleged example of a topmost leader has been declared immune by the pardoning power.

There remains, among others, the question whether and when a defendant has "suffered enough." Attempts to measure relative suffering must commonly be, and would be in the present case, grossly inexact and unsatisfactory. The agonies of a President, exposed to the glare of daily publicity and the thunder of daily attack, are surely unparalleled by the travails of inconspicuous people caught in the criminal process. On the other hand, fairness would demand a huge discount for the corollary facts that a President has sought the spotlight, won it along with the trust and hopes of the people, and therefore became exposed to what he and everyone would expect when charges of betrayal were brought. A President falls from, because he has been raised to, a dizzying height. Except to know that the qualities of many experiences are magnified and deepened by his posi-

1. Model Penal Code § 7.01(1)(c).

2. A lawyer-like concern for accuracy compels an aside to say that some current generalities about "white-collar" versus "blue-collar" crime are swift and uncritical. The armed robber and the embezzling bank official are likely to be dissimilar in an array of respects relevant to sentencing. But all of that is not vital for today's concerns in the case at hand.

tion, we have no scale on which to weigh his sorrows against those of others.

The question about "equal justice" continues to demand an answer. (The quoted phrase is essentially redundant, however familiar. The word "justice" must entail "equality," though that does not exhaust its meaning.) The ideal is not easily reached. It is not achieved by treating everyone alike. The objectives are to treat "like" people alike while taking account of meaningful differences. Where differences are discerned —between people or their crimes or both —they are to be justly appraised. The armed robber is different from the shoplifter, the impoverished thief from the rich embezzler, the professional from the passionate offender, the petty miscreant from the violator of high trust. The differences suggest value judgments as to where the weight of severity should fall.

Making the comparison thrust upon us by recent events, it is difficult to tip the balance against the defendant before us. And yet the answer must in the long run be clear: if people in high (or even the highest) places may on occasion have been dealt with too easily, the remedy is not to loosen the bonds of law and decency for all of us. It is to resolve that we shall strive more earnestly, at every level, to enforce the rule of equality under the law.

Having thought recently on this subject in a comparable case, this court wrote:

> "We are, for much more than a slogan, a government 'of the people.' We are not led by any permanent or sacred aristocracy, anointed to do its will and pronounce our standards, good or evil, from on high. To be sure, we look for leadership to those we select. But we select them. And in the end it is we who govern them, not they who govern us. The Supreme Court recalled a while ago, and we do well never to forget, two bed-

3. United States v. Paterno, 375 F.Supp. 647, 648 (D.C., 1974).

rock propositions as James Madison declared them for us:

> 'The people, not the government, possess the absolute sovereignty.'
>
> \*    \*    \*    \*    \*    \*
>
> 'If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people.'[1]

1. New York Times Co. v. Sullivan, 376 U.S. 254, 274, 275, 84 S.Ct. 710, 723, 11 L.Ed. 2d 686 (1964).

"It follows that the missteps of people in power are no excuse, and should be no cause, for our breaking faith with ourselves. Wrongdoers in high places and low must be brought to justice. Whether or not that ideal is always achieved, our standards of law and morality are rooted in the people. If the poet may be paraphrased without disrespect, it is to ourselves, not the occasionally fallen star, that we must look for the preservation and steady renewal of our deepest values."[3]

We adhere to those views for the long run. But the defendant before the court neither lives nor pleads in a long run. He is here short days after Sunday, September 8, 1974. Sentencing, as reflected in the title of a recent and valuable book,[4] is still an exceedingly "human process"—variable, disorderly, riddled with the uncertainties produced by the differences among well-meaning judges. The judges of this Circuit, assembled in annual conference, spent much of last weekend brooding together over the grim subject of "disparities" in sentencing. Many were driving home from those sessions when the pardon of last Sunday was announced. We may pretend, but can never manage entirely, to ignore such juxtapositions of events in the imposition of sentence. Certainly the people sentenced cannot be expected to ignore them. And we must pay attention to their sense of justice too—not

4. J. Hogarth, Sentencing as a Human Process (1971).

least of all on the ground taught by Saint Thomas Aquinas, that the person punished must, if possible, be moved to "accept" his affliction as the just consequence of a just system.

Having tried to review the many pertinent factors, and having recorded some major portions of the effort, the court concludes that in the particular case at bar, at this particular time, the prison sentence cannot justly be executed. Accordingly, the motion for reconsideration will be granted, execution of the prison sentence will be suspended, and defendant will be placed on probation for a period of one year in addition to paying the fine of $1,000 heretofore imposed.