UNITED STATES of America, Plaintiff,

v.

John M. KING and A. Rowland
Boucher, Defendants.

No. 75 Cr. 70 (MEF).

United States District Court,
S. D. New York.

Jan. 10, 1978.

Robert B. Fiske, Jr., U. S. Atty., for the Southern District of New York, New York City; Paul Vizcarrondo, Jr., John R. Wing, Asst. U. S. Attys., New York City, of counsel.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for defendant, John M. King; Michael F. Armstrong, New York City, of counsel.

Maloney, Viviani & Higgins, New York City, for defendant, A. Rowland Boucher; Andrew J. Maloney, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

On July 1, 1976, these two defendants were found guilty by a jury on all counts of an indictment charging a course of grossly fraudulent conduct entailing losses in the many millions of dollars to uncounted numbers of investors. On September 7, 1976, reckoning with a host of factors—*inter alia*, that these were first convictions, that there were favorable circumstances in both careers, that defendant King seemed clearly the more culpable, that the crimes were serious, and that neither defendant exhibited any semblance of remorse or contrition—the court imposed, as always, the least severe sentences consistent with the ends of justice, a year in prison for Mr. King and seven months for Mr. Boucher, each term, to be followed by three years' probation.

The defendants were freed on bail pending appeal. The appeals, reflecting the length and vigor of the trial, took some time. The convictions were affirmed on July 22, 1977. 560 F.2d 122 (2 Cir.). Certiorari was denied on October 31, 1977. —— U.S. ——, 98 S.Ct. 404, 54 L.Ed.2d 283.

In the meantime, on November 12, 1976, defendant King suffered a stroke with temporary right-side paralysis, loss of the ability to communicate, and other damage. He has recovered in notable measure, but will never recover completely, and requires con-

tinued therapy. On that basis, recounting in detail the course of his illness and his therapeutic needs, Mr. King moves under Fed.R.Crim.P. 35 to have his sentence reduced to probation or, alternatively, to have specified a place of confinement where his medical needs can be met as adequately as they are being served outside of prison. In separate papers, on grounds less compelling in themselves, Mr. Boucher also moves for a reduction.

There is no question that Mr. King suffered a serious stroke and, equally, no question that he has, as one of his doctors says, shown "remarkable improvement." Fortunate in one important respect, he has had the benefit of an extraordinary amount of seemingly magnificent (and costly) medical care, with numerous doctors and a large number of therapists involved in his treatment and/or examination for purposes of the instant motion. It seems plain that confinement in prison creates a prospect for Mr. King of adverse consequences more severe than those suffered by the average defendant suffering such a fate. But this cannot be decisive in itself. The young athlete may suffer in prison agonies inaccessible to aged felons. The degrees of misery range widely, exceeding our knowledge, and extending, it appears, to those for whom the relief from autonomy is a boon. The court is called upon here to weigh an array of factors: the degree, necessarily conjectural, to which prison will or may be hurtful, the time since the stroke and improvement since then, the relative severity of the sentence and wider impacts of its reduction at this late date, and the fact that officials in the Executive Branch are bound to care for prisoners and guard against or remedy unduly severe consequences of imprisonment.

The court has paid special and close attention, naturally, to the estimates and prognoses of Mr. King's several doctors. The neurological surgeon, Dr. Robert E. Edgar, who directed his treatment from and after the stroke, wrote a detailed letter on November 16, 1977, for purposes of this motion. At that time, a year after the stroke, Dr. Edgar described the original symptoms, Mr. King's "remarkable progress," the remaining sequellae and need for treatment, the current therapeutic regimen, and his prognosis. As to the original condition and progress under treatment, he wrote:

"Mr. King experienced a stroke involving the dominant half of his brain approximately one year ago. This resulted in his complete inability to speak, read, write, view television, perform mathematics, and his partial inability to understand the spoken word, conceptualize complex ideas or abstractions, partial loss of motor strength of the right side of the body and concomitant loss of sensation.

"During the first period of time following this stroke he made remarkable progress in certain areas and either none or limited progress in other areas of brain function. His ability to speak has improved remarkably, although he still exhibits anomia, word substitution, halting speech and other elements of expressive difficulty. His ability in reading, writing, mathematics, complex ideation and abstraction has not improved much beyond the ten percentile range as compared with the dramatic improvement in his expressive speech. His sensory loss, motor loss in the right arm and leg and body have not improved by comparison.

"Despite this current plateauing, he will without doubt improve further if current treatment is allowed to continue since he has completed only approximately one third of the treatment time required at a minimum in this type of therapy program to permit maximal benefit from the standpoint of brain function. The current therapy program has been amazingly successful if one is aware of the fact that an individual with this type of stroke, a so-called 'Gerstmann's Syndrome' rarely ever improves to the point Mr. King has already reached. From a medical point of view, his continued improvement will be a function of continuation of his current regime."

A lay reader might imagine a trace of inconsistency between the observation that

Mr. King had already improved to a rare degree considering his disease and the prediction that "his current regime" would cause still further improvement. But that may be a mistake; it is sufficient to note this, observe the lack of a fully persuasive explanation, and pass to concerns of clearer consequence. Dr. Edgar's letter proceeds further as follows:

"Mr. King's current therapy regime could be described as three-pronged. One element is a structured rehabilitation therapy program under the formal control and auspices of both the Craig Rehabilitation Institute in Englewood, Colorado, and the Rusk Institute of Rehabilitative Medicine in New York City. Another component is the individual rehabilitation efforts of Mr. King himself made possible by his apparent unique capability, intensity of effort, desire to improve, and his inner reaction to his uniquely complex environment and its associates [sic] stimuli. The third element is the natural reorganization and healing of the brain, both in the area of stroke and other areas.

"All three elements of rehabilitation therapy are completely interwoven and disruption or alteration of any element would probably result in permanent damage to Mr. King's brain function and his inability to recover further."

Notwithstanding that flat certainty of the essentiality of all three elements, the court was advised at oral argument of this motion, on January 9, 1978, that two of the prongs have been eliminated: Mr. King no longer receives therapy at any hospital or medical facility, but does, according to the papers and counsel's description, spend six to eight hours daily being assisted to improve by family and friends (not professional therapists). The papers and counsel also stress that such attentions, given in affectionate and familiar circumstances, are highly useful to Mr. King, and the court has no reason to doubt this.

Proceeding from his appraisal of the combined therapeutic elements last November and their indispensability, Dr. Edgar concluded his letter to counsel this way:

"In the final analysis, pursuant to your request for my considered opinion, I believe that it is predictable and foreseeable that incarceration of Mr. King in a sterile prison environment would doubtless arrest or regress his otherwise equally foreseeable progress if the current regime is permitted to continue, and would result in fact in permanent damage to him for the rest of his natural life.

"From a medical standpoint, it would be imperative, I would think, not to negatively alter his present successful rehabilitation program and medical treatment."

A second physician, Dr. A. George Fleischer, specializing in physical medicine and rehabilitation, notes that Mr. King has, since his November 1976 stroke, had "a series of documented transient ischemic attacks" or, as Dr. Edgar called them, "recurring smaller strokes," a further problem requiring care and attention. He confirms the need for continued speech therapy if Mr. King is to achieve maximum cure. He says: "If [Mr. King] is incarcerated, it is mandatory that care must be taken to keep him oriented to time and care must be taken to keep him very busy in order to control his mood swings."

Another rehabilitation specialist, who is also a cardiovascular researcher, Menard M. Gertler, finds significant that this "exceedingly well nourished, well developed" patient has a history of small strokes, and that this is a matter of concern and treatment. He notes that defendant's "father living at 79 has had many strokes according to the patient * * *." He concludes:

"It is difficult for me to reconcile the sophisticated form of treatment which Mr. King requires in an area of confinement outside a good medical center or a good medical environment. I do not believe that confinement is conducive to improving the health and well being of a patient like Mr. King. There is a strong possibility that much harm could come as a result of improper medical care."

Another neurologist, Dr. Mark L. Dyken, says of Mr. King:

"The rather remarkable improvement since he first entered therapy and his continued improvement on therapy would make it extremely risky to interrupt the current program. I strongly support your conclusions that he should continue in the rehabilitation at Craig Hospital, or if this is impossible, at least a program of similar quality. A prison term could very likely seriously interfere with progression and possibly contribute to a regression."

Dr. Dyken evidently assumed, contrary to the fact as now given to the court, that Mr. King was in a continuing program at Craig Hospital.

Another neurosurgeon, Dr. Ayub K. Ommaya, who saw and wrote of Mr. King a month ago, expressed concern over the transient ischemic attacks, suggested an evaluation by another specialist in St. Louis, and recommended that the patient "be considered for a micro-vascular bypass of the ischemic area and supplementation of the blood supply to the left hemisphere by an anastomosis of the branches of the supraficial temporal artery to the middle cerebral artery * * *." It does not appear that the recommendation of a consultation or consideration of surgery has been further pursued. Dr. Ommaya concludes:

"In view of the progressive nature of his disease and the possibility of surgical treatment in the near future I would concurr [sic] with the findings of his former physician that Mr. King remain under close medical observation and preferrably [sic] be admitted into a medical center where further investigation and treatment as outlined above can be pursued. Incarceration would be contrary to this recommendation and would prevent what I believe in [sic] the best medical management in this case."

The net of these opinions is that Mr. King needs continued therapy for his loss of reading, reasoning, and memory capacities, though not by professionals or in a medical facility; that his cardiovascular condition requires continued and careful attention; and that he probably cannot equal in prison the kind of superb medical ministrations he has had to date. Having shown that much, Mr. King's attorney argues that "the Government must conclusively prove" the contention he anticipates, "that the federal prison system has facilities and personnel capable of providing Mr. King with adequate treatment." If the standard were conclusive proof, Mr. King would surely prevail, as would almost any party opposing an adversary so burdened. But the court on this subject, as on others, must be satisfied with probabilities and predictions rather than certainty.

In that regard, it should also be said that despite language verging upon the sound of certainty, the doctors' letters produced for Mr. King are necessarily characterized by some substantial measure of conjecture. It is clear from the letters as a whole that the degree of further improvement for which Mr. King may hope, having improved far past expectations thus far, is highly speculative. It is clear, too, that much will depend upon his own motivation and self-help, as it depends now at home, a matter on which Mr. King's history of focused vigor and determination augurs well for him.

Having said that much, the court must nevertheless be concerned with where Mr. King will be housed and how he will be cared for if he is imprisoned. We start with the fact that this defendant is now fully able to care for his own daily needs, to attend to his surroundings, to read, think, play and work. His vestigial loss of right-side functioning, seemingly as improved as it will become, is not disabling. He is not in any substantial sense crippled. He appears to manage handily activities like a two-day hunting trip last November and long trips for medical examinations. Indeed, such efforts are viewed as therapeutic for him. He is, in sum, in better condition than many come to exhibit as they age or grow ill during imprisonment, and less disabled than at least some at the time they begin service of their sentences. These facts lead us in turn to be reminded that, with its total complement approaching 30,000 prisoners, the Federal Bureau of Prisons is expected to have facilities suited for people suffering

serious illness or disability. And the papers before the court supply pertinent information on this score.

At the United States Medical Center in Springfield, Missouri, the court is advised, there is a full-time neurosurgeon, a neurologist under contract, and three or four certified neurologists as well as three neurosurgeons in the area. There is a speech therapist and a physical therapist, and programs in speech, physical, and occupational therapy. There is a staff of certified psychologists available to assist in Mr. King's rehabilitation. The center is equipped to continue his anticoagulation therapy for the small-stroke problem. The medical staff would stand ready to consult with any physicians currently treating him regarding his condition and rehabilitative needs.

The Medical Center now houses and cares for patients whose conditions appear to be as serious as, or more serious than, Mr. King's. These include stroke victims, paraplegics, and people with serious heart conditions.

A speech pathology consultant at the Center conducts twice-weekly half-hour training sessions with patients requiring speech therapy. In addition, she instructs staff on working with such patients. She acknowledges the potentially disruptive effect on Mr. King of confinement in unfamiliar surroundings, but observes, as counsel and Mr. King's doctors have undoubtedly known, that these effects will be lessened if his current therapists have been preparing him for the ordeal. Like others at the Center, the speech pathology consultant expresses willingness to seek guidance for Mr. King's treatment from those currently in charge of his therapy.

The court concludes that Mr. King will probably not receive in Springfield care as salubrious or congenial as he has at home. At the same time, it seems evident that the overwhelming majority of people, in or out of prison, cannot have the benefit of such outstanding attentions as he has had in the 14 months since his stroke. On the other hand, there is powerful ground to anticipate, especially upon the foundation of the record now being made, that the care Mr. King may anticipate will be, in counsel's word, "adequate." Furthermore, the question is not to be considered as if the failure of this prediction must be fatal either to Mr. King or to the achievement of justice in his case. If neither Springfield nor any other federal facility can handle Mr. King's medical problems within the bounds of substantial adequacy and decency, his jailers have an obvious duty, which the court will not presume they would ignore, to see that a year's sentence becomes one neither of excessive cruelty nor, worse, of death.

Before reemphasizing that relevant thought, the court must note, at least briefly, some other things that bear upon the business, never cheerful, of criminal sanctions. There is moral and legal force pressing us to keep in mind that a sentence imposed so long ago should be served rather than nullified. To be sure, the unhappy onset of Mr. King's illness is a fact to be reckoned with. But there are other facts, briefly noted already, that weigh heavily in the scales. To repeat a point of consequence, the court followed in this, as in other cases, the policy of imposing the least severe sentence conformable to the perceived ends of the particular judgment. The overriding goals of general deterrence and marking the gravity of the offenses would be sharply disserved by a reduction. The concern for equal justice also has a somewhat special point in this case: having commanded extraordinary wealth, including millions of dollars acquired fraudulently, Mr. King, despite huge reverses, seems able still to have means sufficient for lavish medical resources, far beyond those available to the run of citizens, with or without criminal convictions. It is not fair or acceptable to make his level and quality of treatment a standard by which prison facilities must be judged. He is fortunate, of course, and it is some comfort to all of us, that he has had 14 months of superb care and a course of notable recovery since his stroke. But the court concludes that the Government need not promise or guarantee equal resources so long as it appears reason-

ably probable, as it does, that there will be adequate resources.

In further support of Mr. King's motion, counsel invoke sentencing opinions in which a defendant's ill health was considered, as it should be, on the side of mitigation. *United States v. Mattox,* 417 F.Supp. 343 (S.D. N.Y.1976); *United States v. Bergman,* 416 F.Supp. 496 (S.D.N.Y.1976); *United States v. Paterno,* 375 F.Supp. 647 (S.D.N.Y.1974). Sentencing is with us an unruly and unpredictable process. But that does not mean this is a good situation. Defendants and their counsel are entitled to press for a decent measure of consistency, at least among the sentences of a single judge. So it is fitting to note that the cited cases have been considered and found on balance to be of little assistance to Mr. King. Without sorting out in detail the salient differences, or matching the "precedents" one by one, the court observes that the prior decisions involved, among other distinctions, sentences (in at least two of the three) for crimes of markedly lesser magnitude,\* the appearance in each case of some contrition, steadily absent here, and the fact that the sentences were on guilty pleas rather than verdicts reached after bitter contest featuring defendants' adherence to a course of false and misleading statements amounting in plain effect to perjury.

Returning to the central subject of Mr. King's health and the problem of trying to predict how he will fare in prison, it is appropriate to acknowledge—in fact, to insist—that judges have no monopoly over, and no exclusive commission to exercise, humane judgment. Conceding in all candor their inability to forecast with total certainty that therapy in prison will be adequate for Mr. King, representatives of the Attorney General, who commands the Bureau of Prisons not less than the prosecutors, assure us of substantial measures they will take to that end. The record is clear and unequivocal on this score. If it should develop that imprisonment is proving in fact to exact an undue toll, the Attorney General has an array of relevant powers—from the granting of medical furloughs to the employment of other treatment facilities or the granting of outright release—to meet that contingency. We are all aware of cases, some notorious, in which powers of this nature have been exercised. The circumstances of this case, including the instant proceeding, give weighty assurance that executive relief will be available, if necessary, to prevent cruel, excessive, and unjust suffering beyond the sufficient measure inevitably entailed by imprisonment. This consideration makes it less urgent than defense counsel suggest to pretend to an utterly confident choice between the forecasts of defendant's physicians and those of the Government.

All things considered, the court concludes that Mr. King's sentence should stand and be served. The Government has consented to his surrender at the Springfield facility, avoiding in that fashion the rigors of travel in the custody of United States Marshals. For that purpose, while it may not be absolutely necessary, and for final preparations by his therapists, Mr. King's surrender date is further adjourned, to January 19, 1978. Except for that, his motion is denied.

Mr. Boucher's motion, which has received full consideration, presents no genuinely new points not embraced in the reasoning upon which his sentence was predicated. His motion is also denied.

It is so ordered.

---

\* The *Mattox* case was a guilty plea early in a multi-defendant trial to a narcotics conspiracy and tax evasion by a paraplegic confined to a wheel chair and lacking "normal control over the simplest bodily functions \* \* \*." 417 F.Supp. at 344. While the stated crime was more serious than Mr. King's, all of the codefendants, in terms of Mattox's plea and the clearly accompanying circumstances, were far more culpable in fact. All the others had been acquitted. If logic might have made that immaterial for sentencing Mattox, considerations merely human made it compellingly relevant.