UNITED STATES of America, Plaintiff,

v.

**Robert B. BARON, Defendant.**

**Criminal No. 95–10118–NG.**

United States District Court,
D. Massachusetts.

Oct. 2, 1995.

Morris M. Goldings, Mahoney, Hawkes & Goldings, Boston, MA, for Defendant.

Mark J. Balthazard, United States Attorney's Office, Boston, MA, for the U.S.

## SENTENCING MEMORANDUM

GERTNER, District Judge:

Robert B. Baron was charged in a one count felony information with bank fraud in violation of 18 U.S.C. § 1344. On May 3, 1995, Mr. Baron appeared before me, waived indictment, and pled guilty. Mr. Baron was sentenced on September 27, 1995.

Mr. Baron is 76–years old with a variety of quite substantial medical problems, as will be described below. He was the president and principal shareholder of Baron Peters Corporation, a now defunct clothing manufacturer, and of its wholly owned subsidiary, ASBP Corporation. The business had been in his family for decades. For most of that time, State Street Bank & Trust Company, was its exclusive lender.

In the mid–1980's, apparently during the "downturn" in the economy, Baron was in need of cash to save the business. He turned to other banks, concealing that fact from State Street. He arranged an annual "flip," executing documents that transferred the corporate debt to himself personally during the period when the company's accountants were preparing their annual audited financial statements. When the auditors contacted the bank in question, they were told that the company owed nothing. In addition, Baron caused false sales documents to be prepared by company employees, reflecting that orders for goods had been placed totalling several hundred thousand dollars. In fact, the orders had never been placed and the sales were never made.

On May 1, 1992, Baron signed two demand notes to the State Street Bank in the amounts of 1.5 million and 1.1 million. By the end of 1992, the company had defaulted on its loans, with the Bank suffering a loss of more than 2.5 million.[1]

The principal issue addressed in this Memorandum is the appropriateness of a depar-

---

1. In addition, in the fall of 1992, Baron obtained a $650,000 loan from State Street. In order to obtain that loan, Baron submitted a personal financial statement which falsely reported that he owned a $750,000 parcel of real estate, and $875,000 in securities, which were in fact owned by trusts in which Baron had no beneficial interest.

Under the terms of the plea agreement, Baron agreed that this conduct may be considered relevant under U.S.S.G. § 1B1.3, although he had not pled guilty to it. He also agreed that the losses, if any, caused by this conduct, may be considered by the Court in ordering restitution.

ture downward on account of Mr. Baron's age and infirmity.[2]

## I. OFFENSE LEVEL COMPUTATION

Although the offense level computation is not contested, I repeat my findings here:

I find the applicable sentencing guideline provides for a base offense level of 6. U.S.S.G. § 2F1.1(a).

Section 2F1.1(b)(1) provides for an upward adjustment if the loss due to the fraudulent conduct exceeds $2,000. Specifically, the losses are more than $2.5 million but less than $5 million, a 13 point upward adjustment is warranted under § 2F1.1(b)(1)(N). An additional two-level increase is warranted because the offenses involved more than minimal planning within the meaning of § 2F1.1(b)(2)(A). I will deduct three points for acceptance of responsibility, leaving an offense level of 18. The defendant's criminal history category is zero, and thus, the guideline range is 27 to 33 months.

## II. DEPARTURES FOR AGE AND INFIRMITY

■ A defendant's age and physical condition are "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.2, Introductory Commentary. However, "age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." U.S.S.G. § 5H1.1.

At the same time as the guidelines discourage age and infirmity departure, the language of this section invites the district court to give the matter serious consideration. See, United States v. Rivera, 994 F.2d 942 (1st Cir.1993). Unlike other areas of the guidelines, where the fact that the Sentencing Commission considered a given factor to a degree undermines its use as a basis for departure, here I am invited to make certain quantitative judgments—the degree of infir

mity of the defendant, the degree to which home confinement is efficient and costly as compared with imprisonment. Rivera, supra at 947–51.

I must make those quantitative judgments about both factors—age and infirmity. Age and infirmity are linked by a conjunction in § 5H1.1 (i.e., the defendants must be both "elderly" and "infirm"). Indeed, I am obliged to read § 5H1.1 (age) together with § 5H1.4 (physical condition). § 5H1.4 begins with the same caveat—that physical condition is not ordinarily relevant in determining whether a sentence should be outside the applicable range, but adds: "However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range, i.e. in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

■ From these guidelines, I glean three areas for consideration: a) the defendant's age; b) his physical infirmity, and c) the efficacy of home detention, as described in §§ 5H1.1 and 5H1.4.

### A. Age

The defendant is 76–years old. His life expectancy is 7.39 years. Few cases involve defendants in this age range, and those that do have found it significant. See e.g. United States v. Moy, 1995 WL 311441 (N.D.Ill. 1995).

Viewing the defendant's age, in conjunction with the "infirmity" standard suggests an inverse relationship between the two. Conditions that may be relatively minor or not life-threatening in a younger person, become life-threatening in the older defendant.

### B. Medical Condition

■ I am obliged to consider whether Mr. Baron's physical impairment meets the following standards a) serious and imminent medical threats [3] b) which would be made

---

2. The other issue, the amount of restitution, was resolved at the sentencing hearing. See transcript of September 27, 1995.

3. See generally, U.S. v. Ghannam, 899 F.2d 327 (4th Cir.1990); U.S. v. Greenwood, 928 F.2d 645

(4th Cir.1991); U.S. v. DePew, 751 F.Supp. 1195 (E.D.Va.1990); U.S. v. Carey, 895 F.2d 318 (7th Cir.1990).

worse by incarceration[4] and/or c) which the Federal Bureau of Prisons could not adequately treat.[5]

## 1. *Medical Condition*

Mr. Baron's medical condition is characterized by three elements: a) first, it is unstable, with several conditions interrelating and potentially exacerbating each other; b) second, a number of quite ordinarily found factors could upset the balance, including stress and the exposure to even common germs; c) third, if the medical balance is upset, the result would be a rapid deterioration to a life-threatening illness.

The complex medical condition consists of the following:

*Pituitary:* Mr. Baron has had several pituitary tumors removed. Dr. Reichlin, Research Professor of Medicine of the University of Arizona, (Exhibit 2) reported that the first pituitary tumor he removed had grown so large as to threaten Mr. Baron's vision. After eight years, it was discovered that the tumor was beginning to grow again. At that point, the pituitary was completely removed.

Since Mr. Baron has no pituitary function, he is being treated with steroid replacement drugs—hydrocortisone, synphroid and testosterone—the hormones normally produced by the pituitary gland. According to Dr. Richie (Exhibit 3), "steroid replacement must be monitored carefully because intercurrent infections or other problems could lead to significant morbidity or even death if not appropriately monitored and corrected on a rapid basis." Synphroid, a medication prescribed for the thyroid deficiency that stemmed from the pituitary tumors, in particular, is a potentially powerful drug whose administration must be carefully watched.

Without a pituitary gland, Dr. Eberlein (Exhibit 1), of the Harvard Medical School noted, "relatively innocuous medical problems (such as a viral illness) may result in life-threatening adrenal insufficiency." Under such circumstances, the treating doctors would be obliged to compensate through drugs for any medical changes, requiring higher doses of drugs to stabilize Mr. Baron, and would have to do so immediately. While Mr. Baron can do some of the titrating himself, the risks of error are substantial. Dr. Reichlin reports that "[a]t the first sign of an infection, such as an upper respiratory infection, or diarrhea, [Mr. Baron] was instructed to increase his dose of hydrocortisone." Yet, despite this, there were at least three instances in which "he became so sick, so quickly that he would have died if he had not been taken to the emergency room and treated with iv fluid and cortisone."[6]

Dr. Dluhy (Exhibit 4) underscored this finding, suggesting that Mr. Baron was at substantial risk for acute adrenal insufficiency which is life-threatening "due to the precipitation of shock."

An ancillary result of the pituitary treatment is that the defendant's sinuses were also destroyed. As a result he has to syringe his nose with a special instrument two to four times a day to empty his sinuses.

Moreover, the removal of two tumors does not suggest that he is free of cancer in this area. Mr. Baron is obliged to get a yearly CAT scan to monitor his pituitary.

*Prostate:* The defendant is suspected of having prostate cancer as well. Although he has had a set of biopsies which did not confirm the diagnosis, 60% of patients with his symptoms have cancer. Again, this condition requires careful follow-up and monitoring (Exhibit 3).

*Cardiac condition:* I received a letter (Exhibit 5) from Dr. Bernard Lown and, in addition, spoke with him on the telephone. Mr. Baron, he reports, has coronary artery disease and hypertension. There is significant lability to his blood pressure, which he concludes, derives from the enormous psy-

---

**4.** *U.S. v. DeCologero,* 821 F.2d 39, 43 (1st Cir. 1987) (quoting *U.S. v. King,* 442 F.Supp. 1244, 1248–49 (S.D.N.Y.1978)

**5.** (*Id.*)

**6.** Dr. Reichlin reported that on one occasion in Florida, because he happened to be treated by a general internist, rather than an endocrinologist "who is alert to the abrupt way that a person who cannot respond to stress can succumb to what would otherwise be a trivial illness," he became quite ill.

chological stress that Mr. Baron is under. In his view, imprisonment would be stressful, a serious hazard to his well being, and could "precipitate a serious cardiovascular event." He characterized Mr. Baron's medical condition as unstable and suggested that any medical intervention to remedy one problem ran the risk of exacerbating others.

I also reviewed medical records which showed hospital admissions in the middle of the night, when Mr. Baron began to rapidly deteriorate.

### 2. *Made Worse by Incarceration*

Dr. Lown was quite clear that stress could trigger a physiological reaction that could be difficult to control. In his judgment—and it is common sense—imprisonment could well be the source of that stress.

### 3. *Prison Showing*

Dr. Reichlin reports the complexity of Mr. Baron's physical condition. He indicates that he doubted that "most general physicians would be aware" of Mr. Baron's unique problems "because hypopituitarism and hypoadrenalism are relatively uncommon" so that few physicians have experience in dealing with pituitary disease (Exhibit 4).

The Bureau of Prisons, in a letter from Dr. Kenneth P. Moritsugu, opined, after receiving letters from these physicians, that "Mr. Baron's medical treatment will be consistent with acceptable community standards." Specifically, Dr. Moritsugu of the Bureau indicated that the Federal Medical Center in Fort Worth, Texas would be an appropriate designation.

While I do not doubt that the Fort Worth, Texas facility is a good facility, I also believe that incarceration, at that distance from his family, will push this defendant into considerable turmoil, and could trigger a life-threatening event. Lesser stresses at an even younger age than Mr. Baron is now, have already done so. Given the speed with which Mr. Baron is likely to deteriorate, and the likelihood that he would be exposed to something that would trigger deterioration (i.e., any germ, any stress), I reject the Bureau of Prison's conclusions. The adequacy of the

facility in the abstract has to be offset by the impact that transferring the defendant to it would have.

### C. *Efficacy of Home Detention*

Keeping infirm elderly people behind bars can cost up to three times more than imprisoning younger offenders, p. 15. Molly Fairchild James, *The Sentencing of Elderly Criminals*, 29 Am.Crim.L.Rev. 1025, 1040 (1992).[7] As a general matter, as well as being costly, imprisonment is not efficacious particularly where the offender is not as likely to commit future crimes as a younger offender. Indeed, the Commission permits home confinement as an alternative form of punishment when home confinement of an elderly and infirm defendant is "equally efficient as and less costly than incarceration." § 5H1.1.

There is no question that home detention is less expensive and more efficient than incarceration in this case. Mr. Baron's wife has a medical background and monitors him on the front lines. He has regular interaction with physicians who are intimately familiar with his situation. The stress of a felony conviction, and the limitation on his freedom engendered by home detention is significant but nowhere near the impact that uprooting him to a federal prison facility would have.

### III. *CASE LAW*

I also have set my decision to depart downward in the context of a number of decisions in which defendants, less aged and to a degree, less infirm, than Mr. Baron were given substantial departures. In *United States v. Maltese*, 1993 WL 222350, *9 (N.D.Ill.1993) the court granted a 62–year old defendant, who had been suffering from liver cancer for a year prior to the sentencing, a downward departure for his sentence accompanying an illegal gambling conviction. The court found that the defendant's life expectancy had been shortened due to an operation for the cancer, and that the defendant's required medical treatment, chemotherapy, would be extremely expensive for

---

**7.** The author notes that the average cost of imprisonment for elderly inmates is $60,000 annually, compared to $20,000 annually for the confinement of younger inmates.

the state to provide.[8] Hence, the court held that Mr. Maltese was sufficiently "elderly and infirm," and that an alternative form of confinement would be "equally efficient as and less costly than incarceration," as required under § 5H1.1 of the Guidelines.[9] In addition, the court found that Mr. Maltese' infirmity arose from an "extraordinary physical impairment," as mandated by § 5H1.4 of the Guidelines.[10]

Similarly, in *U.S. v. Moy*,[11] the court granted a downward departure to an elderly defendant (age 78) who suffered from coronary artery disease, a recent hernia repair, and a history of depression. The combination of Mr. Moy's age and medical history, his substantial family responsibilities (he provided daily care to his partially incapacitated wife), and his prior "hardworking lawful life as a businessman and civic leader of excellent repute," influenced the court to lower his sentence from the prescribed 78–97 month sentence for an illegal gambling conviction.[12] The court ultimately reduced the defendant's minimum sentence by 61%, allowing a 48–month departure to a 30-month sentence.[13] *See also United States v. Libutti*, 1994 WL 774647 (D.N.J.1994) (departure for 62–year old defendant, suffering from coronary problems, a personality disorder and several psychiatric conditions and phobias); *United States v. Dusenbery*, 9 F.3d 110, Unpublished Disposition (6th Cir.1993) (departure due to age and medical condition, the removal of both kidneys, and the necessity to undergo dialysis three times a week).[14]

## IV. *SUMMARY*

Therefore, I find appropriate a downward departure from a level 18 to a level 10, sentencing this defendant to one year probation, 6 months of which is to be served in home detention. Judge Weinstein summed up this issue best:

> The best policy considerations can be unnecessarily cruel when applied rigidly and without exception to individual human beings ... Some [offenders] would be destroyed by a term in prison. There are defendants for whom prison incarceration makes no sense.

Weinstein, *Prison Need Not Be Mandatory, There are Options Under the New U.S. Sentencing Guidelines.* 28 No. 1 Judge J. 16 (1989). Mr. Baron is one such human being.

**SO ORDERED.**

**8.** *Id.* at *10.

**9.** *Id.* at *10.

**10.** *Id.* at *10.

**11.** 1995 WL 311441 (N.D.Ill.1995).

**12.** *Id.* at *26–*31.

**13.** *Id.* at *34.

**14.** Each of these cases involved substantial departures; in some cases 40%—60% reductions. None involved home detention in part, one would surmise, because the guideline sentence was substantial. Here, the guideline sentence is in the 27 to 33 month range.