UNITED STATES of America,

v.

Donald A. WILLIS, a/k/a
"Duke", Defendant.

No. 03–10207–NG.

United States District Court,
D. Massachusetts.

June 23, 2004.

Mark J. Balthazard, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

Peter T. Elikann, Law Offices of Peter Elikam, Boston, MA, for Donald A. Willis (1), Defendant.

## SENTENCING MEMORANDUM

GERTNER, District Judge.

The defendant, Donald A. Willis (hereinafter "Willis"), is a 69–year–old man, who is obliged to take several medications to treat multiple, serious, and deteriorating medical problems. Defendant moved for a downward departure because of:

1. Ill health, pursuant to U.S.S.G. § 5H1.4;

2. Age, pursuant to U.S.S.G. § 5H1.1; and,

3. Good works, pursuant to U.S.S.G. §§ 5H1.6 and 5H1.11.

While I had no doubt of Willis' strong background of commitment to family, church, and community—a 37–year marriage, voluntary service in the Air Force Reserves during the Cuban Missile Crisis—given the rigid case law in this area, I had no choice but to conclude that there was no basis for a departure on that ground here. Cf. *United States v. Mehta,* 307 F.Supp.2d 270 (D.Mass.2004). However, as described below, I did depart based on Willis' physical condition and age.

The government also argued that Willis deserved a sentencing enhancement under U.S.S. G. § 3B1.1(c) because of his role in the offense. Both defendant and probation disagree; I adopted their position.

I sentenced Mr. Willis to probation, six months of which is to be served in home

detention with electronic monitoring, which would enable him to continue to see his doctors and continue the course of treatment he has begun for his various ailments. In addition, I ordered Mr. Willis to pay substantial restitution, $362,368.00, and to cooperate with the Internal Revenue Service to determine his prior tax liability. This memorandum reflects my findings.

## I.  INTRODUCTION

### A.  *Facts*

Willis pled guilty to failing to report income derived from his illegal gambling business on his individual tax return, and failing to have tax returns prepared or filed for the gambling business.[1]  Willis accomplished the evasion by arranging to have the proceeds from his business deposited in his personal bank account, so that they could not be traced by the Internal Revenue Service.  George Chute [hereinafter "Chute"],[2] the manager of Willis' business, collected most of the cash, and made small deposits into Willis' personal bank account.  At no time did Chute cause 1099 or W2 tax forms to be issued.

In order to have some modest income to report to the IRS and to help Willis qualify for Social Security benefits, Willis arranged for Martin Hanley [hereinafter "Hanley"],[3] an individual who had borrowed money from him, to make payments to him as if they were legitimate salary

payments and to issue 1099 forms to him and later, to his wife.  Willis then reported the 1099 income and Hanley deducted Willis' phantom salary from his business.  When the amounts exceeded the debt owed, Willis would reimburse Hanley in cash.

The felony information to which Willis pled did not charge participation in a gambling enterprise, pursuant to 18 U.S.C. § 1084(a).  Nevertheless, the government provided Probation with the following information for the "offense conduct" portion of the pre sentence report: Willis was the principal of an illegal gambling business that operated for ten years out of an office at 250 Prospect Street in Waltham, Massachusetts.  He was assisted in the operation of the business by Chute, who was his primary manager, and also by his brother, Paul Willis, who supervised when the defendant was away.  The defendant claimed that he was not responsible for the day-to-day operation of the business because for the past decade he was living in Florida either six months of the year, or the entire year.  Since the gambling business was not "relevant conduct" in the tax offense (see below), the issue of Willis' role in it was not litigated.

## II.  THE GUIDELINE COMPUTATION

Willis' plea yields a base offense level of 17, pursuant to U.S.S.G. § 2T1 (for a tax

---

1.  On June 12, 2003, a four-count felony Information was filed in U.S. District Court, charging Donald Willis with filing a false tax return, in violation of 26 U.S.C. § 7206(1). Count I charged failure to file taxes on or about April 10, 1997; Count II—on or about April 4, 1998; Count III—April 19, 1999; Count IV—April 2, 2000.

2.  Chute pled guilty to interstate transmission of wagering, 18 U.S.C. § 1084(a), and three counts of Filing False Tax Returns, 26 U.S.C. § 7206(1).  At age 54, Chute received 15

months' imprisonment, $400 special assessment, restitution in the amount of $53,981 and a fine of $4,000.  The defense did not move for a departure on any grounds.

3.  Hanley pled guilty to a one-count Information charging him with Filing a False Tax Return, 26 U.S.C. § 7206(1).  On November 25, 2002, Hanley was sentenced to three years' probation and restitution of $43,802. He received a downward departure for substantial assistance under U.S.S.G. § 5K1.1.

loss between $325,000 and $500,000). Two points were added because the source of the income exceeded $10,000 in a given year, and derived from criminal activity, pursuant to (U.S.S.G. § 2T1.1(b)(1)). Three points were deducted for acceptance of responsibility (U.S.S.G. § 3E1.1(a) and (b)), yielding a Category 16. Since Willis had no criminal record, his Guideline range was 21–27 months.

## III. *ROLE IN THE OFFENSE*

The parties agreed that defendant's illegal gambling business should not be considered when determining "role in the offense." That conduct was plainly not "relevant conduct" in a sentencing for the offense of filing false returns.

■ Nevertheless, the government argued for a two-point enhancement—looking only at the tax return offense. Willis, the government maintained, supervised Hanley, by directing him to pay Willis back for Hanley's loan in checks issued on Hanley's business, for which Hanley issued 1099 forms to Willis and his wife.[4]

I disagreed. The "role" guideline increases the sentencing score depending upon the number of participants in the offense, and the defendant's role vis-a-vis those participants. The more participants the defendant organizes or leads, the higher the score. *See* U.S.S.G. § 3B1.1.[5] In effect, § 3B1.1 boils down to a simple observation, that an individual in a leadership position in a larger organization will make higher profits, pose a greater danger to

the public, and a greater danger of recidivism. *See* Background Note to § 3B1.1; *United States v. Footman*, 66 F. Supp 2d 83, 93 (D.Mass.1999). As such, the concept loses significance in small scale criminal offenses. *See* Background Note to § 3B1.1. *Cf. United States v. Payton*, 59 Fed.Appx. 517, 521, 2003 WL 264705, *4 (4th Cir.2003) (unpublished); *United States v. Treadwell*, 11 Fed.Appx. 502, 512, 2001 WL 599709, *10 (6th Cir.2001)(unpublished). It is especially problematic in the offense of tax evasion committed by a single taxpayer.

In any event, I concluded that Hanley and Willis were equal participants in a tax evasion scheme, rather than one in a subordinate position and one in a managerial role. Hanley borrowed from Willis and paid him back in a form that not only helped Willis deal with his tax and social security problems—the form of the repayment also helped Hanley with his own taxes. Hanley filed false tax returns that benefitted his own business on multiple occasions.

With respect to Chute, the government's theory that Willis supervised Chute because Chute made payments to Willis in cash, made no sense. It is inconceivable that Chute had to be directed by anyone, much less Willis, to distribute the proceeds of an illegal gambling operation in cash. Indeed, by the government's logic, every time a putative tax evader asks for a blank receipt from a cab driver for the cash he

---

4. The Presentence Report indicated that Willis arranged for Hanley to issue 1099 forms to Willis until 1997 when Willis reached retirement age. At that point he had Hanley make the checks payable to his wife to help her qualify for Social Security Benefits. These payments continued after Hanley's loan had been repaid, with Donald Willis reimbursing him in cash for the fictitious checks.

5. A "participant" is defined in the Guidelines Application note as follows: "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1). " 'Criminal responsibility' is a term of art in the criminal law, connoting a certain culpable state of mind." *United States v. Ribot*, 97 F.Supp.2d 74, 80 (D.Mass.1999).

has paid, he would be exercising supervisory authority over the driver.

The question was not only—Did the defendant go through the motions of directing someone else to do something, assuming that someone else is a "participant" under § 3B1.1.? The question was whether the defendant is somehow more culpable for having done so—more culpable than an ordinary criminal in a small scale operation. Nothing about the defendant's relationship to either Chute or Willis qualified for this treatment.

## IV. *WILLIS' PHYSICAL CONDITION*

Willis, at age 69, suffers from the following medical conditions, all confirmed by reports from various specialists whose care of Willis predated his legal problems:

1. A history of phlebitis (According to the medical report, "can and will be life threatening without medical attention" and Willis needs to be seen on a "chronic" basis. If a blood clot got lose, it would cause death by going to the heart.)

2. A significant risk for deep venous thrombosis with pulmonary emboli. (This is also potentially life-threatening as pulmonary emboli can break off, pass to and obstruct the arteries of the lung.)

3. A one or two block claudication (Atherosclerosis causes the arteries in the legs to become narrow since fatty material has attached itself to the walls of the artery. Then, not enough blood flows to a muscle. This causes extreme pain to Don Willis's calf or thigh muscles if he even walks one block.)

4. Severe varicose veins with inflammation (This can be very painful, lead to more serious problems and may also signal a higher risk of other disorders of the circulatory system.)

5. Chronic lymophocytic leukemia (Although he, frankly, is in the early stages of this cancer of the blood and its progression typically moves slowly, it could suddenly begin to progress rapidly. Willis was told to check his lymph nodes daily and be regularly checked by his physician until chemotherapy is needed.)

6. Hypertension (abnormally high arterial blood pressure which is currently under control with medication).

7. Benign prostatic hypertrophy (an enlarged prostate).

8. Hematuria (This is, in other words, blood in the urine, which is usually the sign of a more serious disease such as disease of the kidneys or prostate.)

9. Colon polyps (This is extra tissue growing in the large intestine section of the digestive tract which are more often than not benign at the beginning, but can turn cancerous if they are not removed.)

10. Hypercholesterolemia (excessive levels of cholesterol in the blood).

11. Heart murmur (His cardiologist has just recommended an echocardiogram to evaluate his heart valves and chambers to determine whether there are any tumors in the upper chamber of his heart.)

12. Degenerative joint disease (Osteoarthritis).

13. Rhinitis (This is a reaction that occurs in the eyes, nose and throat when airborne irritants (allergens) trigger the release of histamine. Histamine causes inflammation and fluid production in the fragile linings of nasal passages, sinuses, and eyelids.)

14. Irritable colon syndrome (This disorder of the intestine features chronic lower abdominal pain and frequency of defecation.)

15. Persistent hypopharyngeal irritation and dyspepsia (an irritation at the bottom part of the throat and burning sensations in the upper part of the gastrointestinal system).

16. Considerable irritation of the endolarynx postcricoid region (This area is the cartilage in the lower part of the organ in the neck that plays a crucial role both for breathing and as the voice box, that works in conjunction with the thyroid and arytenoid cartilages.)

17. History of impaired carotid circulation (This is the principal artery, found on each side of the neck, that carries blood from the heart to the brain and the tissues of the head and neck.)

18. Laryngopharyngeal reflux (This is a backflow of acid from the stomach into the esophagus and then throat and voice box.)

19. Esophageal polyps.

20. Chest pains.

21. Extensive degeneration in the cervical spine, cervical spasm (In other words, he has a bad back.)

22. Calcified plaque within the left carotid artery within the neck.

23. Possible pulmonary air trapping (This is the retention of excess gas in all or part of the lungs, at any stage of expiration. It is a finding characteristic of obstruction of the airways.)

24. Reports also indicate that Willis has chronic difficulty clearing his throat and had an amputation of part of his big toe. (Approximately a dozen years ago, a biopsy led doctors to believe that it was cancerous. Although they were about to amputate the entire toe, it was decided that if they only amputated part of it, they could do a much more conclusive test on it. It turned out not to be malignant.)

The sentencing hearing took place over two days. At the October 28, 2003, hearing, counsel for the defendant submitted numerous medical records of physicians and specialists who treated Willis over the past several years. These reports were replete with warnings by physicians of his need to be constantly monitored and tested for many of the ailments. Dr. Edward Geller, a specialist in veins, stated: "The repeated phlebitic episodes that [Willis] has can and will certainly be life threatening without medical attention, and I will need to see him on a chronic basis every two-to-three months probably for the near and far future." Dr. Geller referred to the "severity" of his case and said he was at "significant risk." Dr. Carl Spirazza, who is Willis' primary care physician, stated, "[h]is medications do require frequent laboratory monitoring as well as office visits." Dr. Frederick Northrop wrote about Willis' problems with hypertension, and elevated cholesterol and noted, "If those conditions cannot be treated in prison with proper monitoring, it would be adverse to his health." See pp. 10, 11 and 12, ¶¶ 1–24 of the Sentencing Memorandum by defendant Donald A. Willis [document # 9].

The government rightfully pointed out that many of these records were over a year to 18 months old. At that point, I suspended the sentencing hearing and asked for updated medical records from the doctors, and specifically asked the following question: "If Mr. Willis were separated from the numbers of physicians now treating and monitoring his numerous medical problems in order to go to prison,

what would be the impact on his health?" The physicians produced updated reports for Willis' counsel, which underscored the themes of the earlier ones—for example, that the disruption of treatment and follow up could very well be life threatening," and "that incarceration will ... result in a deterioration of his currently stable health status," which will impact his "life span." (Dr. Spirazza, December 18, 2003); that Willis suffers from an "inordinate number of medical problems," none of which is currently life-threatening, but each of which would result in an "acute medical crisis," especially his phlebitis "which could result in blood clots and pulmonary emboli." (Dr. Olson.)

The government went further, conducting phone interviews with the doctors, with an agent listening in on the line. The agents wrote up their notes and the doctors were asked to verify whether the interviews were accurate.

In January of 2004, the government argued that the first version of Mr. Willis' condition, presented at the October hearing, which predicted onerous consequences were Willis to go to prison, was based on faulty information about the Bureau of Prisons [hereinafter the "BOP"] and its capacity to treat offenders. (Many of the doctors took their view of prisons from television shows or movies, the government reported.) The second version, rendered on the telephone, after the Assistant United States Attorney apprised these doctors of the wide-ranging capacity of the BOP to deal with a host of medical conditions, was arguably more accurate.[6] As a result, each doctor modified his or her opinion about the impact of Willis' incarceration on his health, suggesting they were less concerned about it after hearing the government's recitation. In addition, the government submitted a letter from

the BOP indicating that it had received Willis' medical records and could adequately treat his condition were he incarcerated.

Neither side offered actual witnesses to be examined.

## V. DEPARTURES FOR EXTRAORDINARY PHYSICAL CONDITION AND AGE

The Sentencing Reform Act ("SRA"), 18 U.S.C. § 3661 provides:

> [N]o limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

This statute predates the Sentencing Guidelines and was recodified by Congress as part of the Sentencing Reform Act (SRA). In addition, 18 U.S.C. § 3553(a) lists the factors to be considered in sentencing, which include, "the nature and circumstances of the offense, and the history and characteristics of the defendant." The sentencing court must also weigh the need for the sentence in the light of the purposes listed in the SRA, to "reflect the seriousness of the offense," to deter future criminality, protect the public, and provide the defendant with needed training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a)(1).

To be sure, the Guidelines that were promulgated by the Sentencing Commission narrowed judicial discretion to consider offender characteristics, particularly with age and physical condition, even beyond what the SRA mandated. U.S.S.G. § 5H1.4 suggests that while "physical condition" is not "ordinarily relevant" in de-

---

**6.** Ellis, Henderson and Sumon, Federal Prison Guidebook (2002).

termining a departure, "extraordinary physical impairment may be a reason to depart downward." Indeed, the Guideline goes on to suggest "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."

Although the Guideline does not define what is "extraordinary" and what is "ordinary," there are several significant themes. First, although the Guideline drafters speak of "extraordinary physical impairment," the remainder of the Guideline seems to embody a less severe standard, "seriously infirm." Second, the Guideline drafters suggest that with respect to the latter, a court is to balance infirmity and cost, allowing for a departure when home detention may be as efficient and less costly than imprisonment.

The same themes are repeated in U.S.S.G. § 5H1.1 with respect to age. While the Guideline notes "age" is "not ordinarily relevant" in determining a departure, "age" may be a reason to impose a sentence below the applicable Guideline range when the defendant is "elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarcer-

ation." Again, the Guideline does not speak in terms of *extraordinary* age or *extraordinary* infirmity, but simply "elderly and infirm." And, again, the Guideline invites the Court to balance infirmity and costs, where home confinement may be less costly than incarceration.

Plainly, the Commission did not define "extraordinary" here or elsewhere, precisely so that courts on the front line of sentencing could define its parameters. A court is supposed to look at the continuum of medical problems in the cases it sees and draw lines as to what fits within this departure and what does not. The task is not an easy one—how to define a pecking order of "extraordinariness" when one person's view of what is extraordinary will not be the same as another's, as I noted in *United States v. Lacarubba,* 184 F.Supp.2d 89, 93 (D.Mass.2002).[7] Nor can the concept of "extraordinary" age or infirmity in the opening sentences of each provision be easily reconciled with the words "seriously infirm," in the second sentence of one Guideline, and "elderly and infirm" in the other.

I used the following principles of interpretation: [8]

---

7. The only conclusion one can draw [from the Commission's failure to define 'extraordinary'] is this: Congress and the Commission wanted *courts* to interpret these provisions as they sought to individualize sentences, to create a common law of sentencing defining the boundaries of typicality and atypicality. How does a court go about this task? The enterprise is in part empirical. How does this human being compare to others the trial court has seen? But it necessarily involves more than simply counting noses. How atypical does he or she have to be—one in a million, five in a million, five percent of all defendants, etc.? This kind of line-drawing involves the exercise of normative judgments: What kind of punishment do human beings facing these situations deserve given the purposes of the SRA? Where ought the line between typical and atypical be? No bright line

rule was announced by the Commission; none can be announced by a court.

*Lacarubba,* 184 F.Supp.2d at 93.

And in evaluating hardship in connection with family obligations, I wrote:

I see a continuum of cases representing the adverse impact of a defendant's incarceration can have on innocent dependants, from the 'ordinary burdens' to 'significantly' more burdens than usual. The issue is at what point on that continuum burdens are imposed on innocent dependents that are simply not justified by our legitimate need to punish the wrongdoer, that are cruel and unnecessary.

*Id.* at 98.

8. See Paul J. Hofer & Mark H. Allenbaugh, The Reason Behind the Rules: Finding and

First, I looked to the purposes of the Guidelines as embodied in the SRA. The Guidelines are concerned about recidivism: What are the chances that a defendant of this age or medical condition would be a recidivist? The physical and mental capacity to engage in criminal activity plainly lessens as the offender gets older. *See* Sol Chaneles, *Growing Old Behind Bars: The Aging of Our Convict Population Brings With It Special Needs and Problems that Few of Our Prisons are Ready to Handle,* Psychol. Today, October 1987, at 47, 49, quoted in Jason S. Ornduff, Note: Releasing the Elderly Inmate: A Solution to Prison Overcrowding, 4 Elder Law Journal 173, 181, n. 67 (Spring 1996). The statute addresses incapacitation: With respect to an elderly defendant, what are the chances that incarceration would be a death sentence? Retribution (concern for the seriousness of the offense) counsels in both

directions, for and against a departure. The harm to society remains the same whether this offense is committed by a young person or an old one. Arguably, with respect to certain offenses, a lesser sentence depreciates the seriousness of the defendant's crime. By the same token, a given sentence may be uniquely disproportionate to the elderly offender; elderly criminals will lose a greater percentage of their lives than younger criminals and may suffer more from the same sentence.[9] Considering the latter, I must look to the BOP's ability to handle an offenders' situation.[10]

And any line that I draw must be consistent with the Guidelines' goal of uniformity: The standard should not amount to a "get out of jail free" card for defendants of a certain age or with certain conditions.[11] Nor should the departure be reserved for

Using the Philosophy of the Federal Sentencing Guidelines, 40 Am.Crim. L.Rev. 19, 73 (2003).

**9.** Again, as I noted in *Lacarubba,* 184 F.Supp.2d at 92:

While it is popular to stress one goal of the Sentencing Reform Act, uniformity, to the exclusion of all others, in fact the drafters endorsed other sentencing goals—notably, proportionality. In its introduction, the Commission described the difficulties of creating guidelines that met both goals. Too much uniformity would create a system easy to administer but would threaten proportionality, while a guideline system that accounted for every conceivable relevant offender and offense characteristic would destroy uniformity and surely be unworkable. U.S.S.G. §§ 1A.4(b), 1A.3.
In *Lacarubba* I went on to note:
The Sentencing Reform Act refers to 'certainty and fairness' in sentencing. 28 U.S.C. § 991(b)(1). Fair sentencing policies must not only avoid 'unwarranted disparities' among defendants similarly situated with respect to the offense, but also 'maintain [ ] sufficient flexibility to permit individualized sentences when warranted

by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.' 28 U.S.C. § 991(b)(1)(B).
*Id.* at 92 n. 6.

**10.** As the court noted in *United States v. Kloda,* 133 F.Supp.2d 345, 348 (S.D.N.Y.2001):

[P]unishment must not be draconian; the judge who sentences must be sensitive to both the goals of society reflected by the efforts of the government, and special circumstances of those awaiting sentence. The judge must sentence in a manner that reflects his role as the implementer of society's search for justice, as reflected by due and timely punishment of those who transgress, without ever being indifferent to a defendant's plea for compassion, for compassion is also a component of justice.

**11.** Obviously, there is no particular age that qualifies for "elderly" much less "elderly and infirm." But there is plainly a correlation between age and infirmity. Conditions not life-threatening in a younger defendant may be life threatening in an older one. *See U.S. v. Baron,* 914 F.Supp. 660, 662 (D.Mass. 1995).

only those "at death's door." [12]

Finally, I need to reconcile the definitions of extraordinary age and extraordinary physical impairment with the themes of the remainder of the section—that somehow one must balance the costs of incarceration against home detention in the case of a seriously infirm, or an elderly and infirm defendant. One way of reconciling these concepts is this: The defendant must first be in the range of physical impairments and/or age which could trigger a departure. Then the court is to balance the costs of home detention vs. incarceration.

I defined the zone of extraordinary physical characteristics in *United States v. Baron*, 914 F.Supp. 660 (D.Mass.1995), which was the only other occasion that I departed on account of age and infirmity in ten years. Baron was a 76–year–old man with pituitary tumors. I noted that physical impairments could be considered as a basis for departure if they met the standard of being "a) a serious and imminent medical threat; b) which would be made worse by incarceration; and/or c) which the Federal Bureau of Prisons ("BOP") could not adequately treat." *Id.* at 662–663.

Extraordinary cannot mean—only those conditions which the BOP cannot handle. It cannot be that if the BOP can accommodate a given medical condition, it is by definition *not* extraordinary. If that were so, there would be no need for the second sentence, balancing costs of home detention and incarceration. Nor would there be any need for the modifier, "adequately." The Bureau of Prisons can take care of a given individual, but at a cost that makes

no sense given the other purposes of sentencing. Moreover, that care may not be "adequate" to the task.

██ Mr. Willis has come forward with a number of doctors who indicate he has serious and substantial health problems, which, combined with his age, would put him at risk were he to go to jail. In the first hearing they were emphatic—he *will* be in jeopardy if he goes to jail. In the second, they were less so—having been told by the government that the BOP is more than capable of caring for a man with Willis' health problems.

In a sense, the doctor's response—that Willis would be harmed by going to jail—is a truism. No doctor would say that this elderly and infirm defendant would be better off in jail, or that jail is as adequate as private care.

At the same time, the government produces evidence to suggest that the Bureau of Prisons could adequately care for Mr. Willis. I have never had a case before me in which the Bureau of Prisons suggested that it did not have the capacity to care for a defendant.

The issue is one of degree. Willis has an inordinate number of potentially serious medical conditions. It seems imminently logical the Willis is at an age where these medical conditions will invariably get worse. It seems logical that being away from his support structure, both family and doctors, will invariably exacerbate his conditions. It seems logical that were he to go to jail for three years between the ages of 69 and 71 that he will emerge in substantially worse shape than he is now, if he does not die before completing his

---

12. The U.S. Attorney suggested that this language that balances incarceration versus home confinement is for someone confined to a bed and arguably at death's door, needing constant monitoring for which the disruption of treatment and follow up would have imminent and dire consequences. Nothing in the language of the Guidelines suggests that point.

sentence. It seems logical that while the BOP can care for him, the costs of that care are bound to escalate. Finally, it seems logical that his conditions at least put him in the zone that enables me to balance the cost of home detention vs. jail, whether home confinement will be "equally efficient as and less costly than incarceration," U.S.S.G. § 5H1.1, or whether "home detention may be as efficient as, and less costly than, prison" as it is described in U.S.S.G. § 5H1.4.

Incarceration of a single inmate costs the tax payer $22,519.32 per year, as Probation reported. Community confinement of one person costs $17,708 per year. Home detention, needless to say, costs much less.

Mr. Willis is not likely to be a recidivist; incapacitation at his age, with these conditions, could be a death sentence. Retribution does not justify his incarceration. The offense is not a crime of violence; the victim, the IRS, will be repaid. Nor is there any danger that this departure will open an exception through which many defendants will seek to pass. There are not many defendants like Mr. Willis.

Accordingly, I concluded that this was an appropriate sentence from which to depart. I departed from a level 17 to a level 10, in order to give Mr. Willis a sentence of probation. I sentenced him to two years' probation, six months of which was to be in home detention with electronic monitoring. Mr. Willis must pay the daily cost of the electronic monitor. As part of Probation, Mr. Willis must pay $362,398.00 to the IRS, notwithstanding counsel's protestations that Mr. Willis had little or no money.

At the conclusion of the sentencing, the government asked for a stay pending the appeal and particularly asked for a stay of home confinement in particular. I indicated that I would give the government an opportunity to consider whether it seeks a stay. Accordingly, I will sign the Judgment five days after the issuance of this Memorandum.

**SO ORDERED.**