**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Benjerman TREADWELL,
Defendant–Appellant.**

No. 99–6548.

United States Court of Appeals,
Sixth Circuit.

May 24, 2001.

Before BOGGS and CLAY, Circuit Judges, and GWIN, District Judge.*

PER CURIAM.

In this direct appeal, the defendant challenges several aspects of his trial on charges of filing false claims and the sentence that resulted from his conviction. We find no error in the district court's handling of delays that resulted in a seemingly long interlude between arrest and trial or its denying the defendant's motion to recuse, which was based on the district judge's expression of frustration with what he regarded as the defendant's attempts to abuse the criminal justice system. The admission of certain self-incriminating statements over the defendant's argument that they were "involuntary" was proper, and the defendant's sentence complied with the United States Sentencing Guidelines. Accordingly, we affirm.

I

On October 14, 1998, a grand jury for the Middle District of Tennessee handed up a four-count indictment charging Charles Benjerman Treadwell with filing false claims against the United States. He initially appeared before a magistrate on October 19th. As both parties prepared for an oft-delayed trial, a grand jury hand-ed up a May 12, 1999, superseding indictment charging Treadwell with two counts of filing a false claim, in violation of 18 U.S.C. § 287, and four counts of aiding and abetting another to file a false claim, in violation of 18 U.S.C. §§ 287 and 2. A jury convicted the defendant on all counts, and the district court sentenced him to 37 months in prison. This appeal followed.

In March 1997, Treadwell filed an IRS Form 1040EZ tax return for himself for the 1996 tax year and aided a fellow inmate in the Metropolitan Nashville–Davidson County Detention Center ("Metro Jail"), Robert DeMoss, to file a similar tax return. Neither had engaged in the employment they claimed. Their returns included falsified W–2 forms showing work at Jetstar Trailer and Wheel, a Nashville area trucking maintenance firm where Treadwell worked prior to his incarceration. DeMoss testified that he placed his return address, social security number, and signature on a 1040EZ given to him by Treadwell, then returned the form to the defendant, who completed it and attached a W–2. The Treasury Department soon issued checks to Treadwell and DeMoss on the basis of their claims.

Satisfied with the results of his fraud, Treadwell jumped at the chance to file additional false claims as soon as the 1997 tax year expired. In mid-January 1998, Treadwell filed a 1040EZ for himself and helped DeMoss and two other inmates, Lawrence Wayne Crutcher and William Howard Newman, Jr., file similar tax returns. All of the men had been in jail throughout the 1997 tax year and had not worked where they claimed. DeMoss testified that he followed the procedures established by Treadwell the previous year. Newman testified that he took many of the

---

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

same steps as DeMoss did before returning the largely blank form to Treadwell, who filled out the remaining spaces and attached the necessary documentation. Crutcher testified that the 1040EZ form signed in his name was a forgery in that it did not in fact bear his signature.

Each of the six returns contained claims of entitlement to approximately $1000 in overpaid taxes. DeMoss revealed that he was to receive $150 for his participation in the scheme, although Treadwell eventually deposited only $100 in DeMoss's prison account. Newman thought he was to receive $150 for his part in the plan. Crutcher, who disavowed personal involvement in the scheme, did not disclose the terms of his arrangement with Treadwell.[1]

Wayne Neighbors testified that Treadwell contacted him in 1997, inquiring whether certain federal tax refunds could be sent to his home and asking him to supply Treadwell with W–2 forms. Neighbors sent the defendant five such forms. Later that year, he received at his address the treasury checks issued to Treadwell and DeMoss on the basis of their 1996 tax returns. Neighbors had a power of attorney enabling him to endorse and deposit checks for DeMoss and Treadwell. The following year, Neighbors acquiesced in the same arrangement. But after receiving the checks in 1998, he turned them over to the IRS because he thought that Treadwell had been incarcerated for too long to be entitled to a tax refund, he claimed.

James Brooks heard from Treadwell in late 1997 or early 1998, when the defendant asked Brooks to provide him with certain income tax material. Brooks went to Office Depot, purchased four blank W–2 forms, and mailed them to Treadwell in jail. Sometime later, Brooks received from Treadwell a large manila envelope containing four smaller envelopes addressed to the IRS office in Memphis. On instructions from Treadwell, he mailed the envelopes and ultimately received two treasury checks made out to Crutcher and Newman at Brooks's home address. Since Brooks did not know who either man was, he mailed the checks to the Ashland City, Tennessee, postmaster.

Paul Connor, a special agent with the Criminal Investigation Division of the IRS interviewed Treadwell at the Metro Jail in Nashville. Treadwell denied having prepared or signed the 1997 return bearing his name and denied any involvement in filing the Newman return. When shown DeMoss's return containing the home address of his friend Wayne Neighbors, the defendant confessed to having provided the address to either DeMoss or Newman in exchange for $150. When confronted with further evidence against him, the defendant made more inculpatory statements but throughout attempted to minimize his involvement in the scheme. He eventually acknowledged signing his 1996 and 1997 returns knowing they were false but maintained that DeMoss or someone else had prepared all the returns. He also admitted asking Brooks to obtain W–2 forms, endorsing his refund check, and depositing, by power of attorney, DeMoss's check in a NationsBank account Treadwell had set up.

Agent Connor searched Treadwell's personal property with his consent. He discovered Government Exhibit 1, a piece of paper bearing an employer identification number, the name and address of Jetstar Trailer, the name and social security num-

---

1. Because the jury convicted Treadwell of having aided or abetted Crutcher in filing a false claim, Crutcher was, in fact, involved in the scheme for purposes of this appeal. Of course, this court expresses no opinion on Crutcher's actual guilt or innocence of any charges.

ber of DeMoss, and certain figures written in columns, all of which corresponded to the blanks on a W–2 form. Connor compared this piece of paper to all six tax returns at issue and found striking consistency among them, including the social security numbers. A second piece of paper found among Treadwell's effects, which became Government Exhibit 17, contained columns of figures purporting to be the wages, income tax withheld, social security tax, and medicare taxes of four different people, including DeMoss.

Treadwell testified in his own defense. He admitted placing his name, social security number, signature, and Mr. Neighbors's address on the 1996 and 1997 returns bearing his name, but he maintained that DeMoss had completed the rest of the forms. He also stated his belief that DeMoss prepared the other four tax returns. He said that Newman and Crutcher had not testified truthfully with respect to him being responsible for filing returns in their names and denied having told agent Connor that he was the source of the computations on the returns in question. Treadwell explained that the figures on Exhibit 17 were merely calculations for potential businesses he was working on for the future. The figures were examples of profit and loss, he said.

Following lengthy delays precipitated by, among other things, Treadwell's successive motions to dismiss court-appointed counsel, the district court conducted a three-day jury trial, which resulted in the defendant's conviction on all counts. The court scheduled a sentencing hearing for October 1999 and approved the subpoena of various inmates who had been incarcerated with Treadwell at certain Nashville-area facilities pending trial of this case. The district court overruled Treadwell's objections to the pre-sentence investigation report and denied Treadwell's request for a downward departure based on pur-

portedly harsh conditions of pre-trial confinement. The court sentenced Treadwell to 37 months on all counts, to run concurrently, and ordered restitution of approximately $2000. Treadwell, represented by new court-appointed counsel (his sixth), timely appealed.

## II

### A

■ The defendant filed two motions to dismiss the indictment for denial of his rights under the Speedy Trial Act of 1974, 18 U.S.C. § 3161, both of which the district court denied. This court reviews for clear error any factual findings made in the course of ruling on a Speedy Trial Act motion, while legal questions are considered de novo. *See United States v. Thomas,* 111 F.3d 426, 428 (6th Cir.1997); *United States v. Carroll,* 26 F.3d 1380, 1390 (6th Cir.1994).

A defendant must be brought to trial within 70 days of "the filing date (and making public) of the information or indictment or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). When the seventy days described in the statute has expired, dismissal is mandatory, though it may be with or without prejudice. *See United States v. Taylor,* 487 U.S. 326, 343–44, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988). The parties agree that the so-called speedy trial clock began ticking on October 20, 1998, the day after Treadwell's initial appearance in this case. His first speedy trial motion was filed 87 days later, on January 15, 1999. His second speedy trial motion was filed on July 15, 1999, 268 days after his initial appearance. His trial finally began on July 27, 1999.

As he did below, Treadwell ignores the provision of the Speedy Trial Act that excludes from the seventy days certain periods of excludable delay. *See* 18 U.S.C. § 3161(h)(1)-(8). Particularly important here, § 3161(h)(1)(F) excludes any period of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion. . . ." Also excluded are any periods of delay resulting from a continuance granted by the district judge if the judge finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A); *see also* 18 U.S.C. § 3161(h)(8)(B) (listing some factors to be considered in making such determination); *United States v. Cianciola,* 920 F.2d 1295, 1297 (6th Cir.1990).

The speedy trial clock ran from October 20th to November 17, 1998, inclusive, as the defendant filed a motion to extend the time for filing pretrial motions on November 18th. Two days later, on November 20, 1998, the district court granted the motion, and the clock restarted the following day. *See United States v. Yunis,* 723 F.2d 795, 797 (11th Cir.1984) (interpreting § 3161(h)(1)(F) and holding that "both the date on which an event occurs or a motion is filed and the date on which the court disposes of a motion are excluded"). The speedy trial clock ran from November 21st to November 22d, inclusive. On November 23, 1998, Treadwell filed a motion requesting a hearing to remove his appointed counsel (Thomas Watson) and proceed *pro se.* The district court conducted an *ex parte* hearing on December 9, 1998, at the conclusion of which it removed defense counsel and ordered appointment of new counsel. As of December 9, 1998, then, 31 non-excludable days had ticked off the speedy trial clock.

Twelve non-excludable days elapsed until the clock stopped again. On December 22, 1998, attorney David L. Cooper filed a motion entering his appearance and requesting a continuance of the trial (then scheduled for December 29th) until March 1999 in order to prepare the defendant's case. The total number of countable days elapsed at this point was 43. While that motion was pending, the district court instructed Cooper and another attorney who had also entered an appearance on behalf of the defendant, William H. Farmer, to clarify Farmer's status. Farmer withdrew from the case. Another intervening order (entered on December 29, 1998) revealed the court's reluctance to grant the continuance if Treadwell did not waive his rights under the Speedy Trial Act. Treadwell refused to do so. Ultimately, on January 12, 1999, the court entered an order of continuance, setting trial for March 30th. This order finally disposing of Cooper's motion ordinarily would have restarted the speedy trial clock, but the district court, in granting the continuance, specifically found that "the interest of justice served by granting the continuance outweighs the interest of the public and Defendant in a speedy trial on the date previously scheduled." The court noted the recent retainer of new counsel and remarked that the defendant would be prejudiced if counsel were not adequately prepared for trial despite due diligence on counsel's part, while the public interest would not be served since any such prejudice could necessitate retrial. These findings invoked the § 3161(h)(8)(A) exclusion and froze the speedy trial clock at 43 days.

On January 15, 1999, Treadwell filed his first motion for dismissal for violation of the Speedy Trial Act. The district court denied the motion. On appeal, Treadwell argues that the intervening December 29th order effectively denied attorney Cooper's motion for continuance, presumably when

Treadwell failed to file the speedy trial waiver mentioned in that order. The January 12th order, Treadwell contends, "retroactively corrected the Speedy Trial error." Def. Br. at 33. Treadwell's argument stumbles over the not insignificant roadblock that no violation of the Speedy Trial Act occurred when the trial, previously scheduled for December 29th, did not begin on that day. The speedy trial clock had stopped at 43 days on December 22d, and attorney Cooper's motion to continue was still pending on December 29th. Even if Treadwell's strained interpretation of the district court's remarks in the intervening order entered on December 29th were correct, *i.e.* that it denied the motion for continuance and restarted the clock, the total number of non-excludable days elapsed on December 29th was just 43. Therefore, the January 12, 1999, order granting the continuance (it also stated the district court's interpretation of its earlier orders, a view significantly more plausible than that presently offered by the defendant) did not attempt to retroactively correct a violation of the Speedy Trial Act, because no violation of the Act had occurred as of December 29th. The defendant filed his first speedy trial motion on January 15, 1999. Even if his view of the December 29th and January 12th orders were correct and the clock restarted the day after the December 29th order was entered, only 57 countable days would have elapsed prior to the January 12th order.

Of course, as explained above, the defendant's view is not correct. The clock stopped at 43 days on December 22d, pursuant to § 3161(h)(1)(F). The intervening December 29th order did not restart the clock because it did not finally resolve the pending motion. The district court's January 12th order kept the speedy trial clock frozen in place, pursuant to § 3161(h)(8)(A). The district court's February 4, 1999, order denying Treadwell's first speedy trial motion was proper.

The January 12th order by its own terms excluded the period through March 30, 1999. In mid-March, the defense filed a motion to continue, which the district court denied. On March 19, 1999, Treadwell filed a *pro se* motion to remove appointed counsel. The court promptly conducted a hearing and dismissed attorney Cooper on March 26, 1999. That order directed the federal public defender to appoint new counsel promptly so that the court could set the case for trial. The order also excluded, pursuant to the § 3161(h)(8) interests-of-justice provision, the "period of delay in the trial occasioned by the granting of defendant's motion for new counsel." On April 6, 1999, attorney R.N. "Bo" Taylor filed an appearance and moved for a 120–day continuance. On April 12, 1999, the court continued the case only until April 27th, instructing Taylor to file a more detailed *ex parte* affidavit to justify his request for more time. On April 21st, Taylor filed the affidavit, and the following day the court continued trial until July 27, 1999, by an order containing the specific findings required by § 3161(h)(8). The court's April 12th order resolved Taylor's April 6th motion; the speedy trial clock began running the following day and ran for eight days up until April 21st, when Taylor filed his second motion for continuance. The court's April 22d resolution of that motion ordinarily would have restarted the clock, as the § 3161(h)(1)(F) pretrial-motion exclusion had ended. However, the court's order again satisfied the requirements for the interests-of-justice exclusion under § 3161(h)(8), so the speedy trial clock remained stopped until that continuance expired on July 27, 1999, the new trial date. (By trial time, several more motions had been filed and resolved, and Treadwell had secured the dismissal of attorney Taylor.

Craig P. Fickling, Jr., filed an appearance on the defendant's behalf.) Thus, when trial finally commenced on July 27th, only 51 non-excludable days had ticked off the speedy trial clock. Therefore, the district court's denial of Treadwell's renewed motion to dismiss for lack of speedy trial, filed on July 15, 1999, was proper.

Treadwell argues that he should not be held responsible for the periods of excludable delay occasioned by the filing of motions to remove counsel and, presumably, the continuances necessitated by appointment of replacement counsel. Yet Treadwell has identified no flaw in the calculation of excludable periods and has not argued that the district court improperly applied the § 3161(h)(8) interests-of-justice provision to exclude the time afforded new counsel for trial preparation. He insists, instead, that he "should not be forced to give up his right under the Speedy Trial Act to protect his right to the effective assistance of counsel guaranteed under the Sixth Amendment...." Def. Br. at 36. As explained, the Speedy Trial Act recognized a right to trial within 70 days, *subject* to certain exclusions identified in the Act. In this case, those periods of excluded delay account for most of the long period between Treadwell's initial appearance and the commencement of trial. Only 51 of the 70 days allowed by the Act had elapsed by the time of trial. Accordingly, Treadwell did not "give up" any rights under the Speedy Trial Act because the right conferred by the Act was not violated but zealously guarded by the district court.[2]

**B**

■ On July 26, 1999, the day before trial was scheduled to begin, Treadwell's counsel, at the insistence of his client, filed a motion seeking recusal of the trial judge because "the court is incapable of providing the defendant with a fair and just trial." The motion was not accompanied by an affidavit conforming to the requirements of 28 U.S.C. § 144, which governs mandatory dismissal of judges for bias or prejudice. The parties agree that the motion should be construed as one seeking disqualification under 28 U.S.C. § 455. This court reviews a district court's denial of a § 455 motion to recuse for abuse of discretion. *See United States v. Hartsel,* 199 F.3d 812, 815 (6th Cir.1999).

The district court conducted a hearing on the motion, at which Treadwell personally testified and explained why he believed Judge Campbell would not conduct a fair trial. One of the points Treadwell raised was Judge Campbell's handling of his motion to dismiss attorney Taylor and proceed *pro se* (the motion resulted in Taylor's dismissal and appointment of attorney Fickling). At that dismissal hearing. Treadwell personally addressed the court and explained his complaints concerning the quality of his counsel. The court was reluctant to grant the motion, in light of Treadwell's history of dismissing counsel and filing speedy trial motions. After the court denied the motion, attorney Taylor sought reconsideration and explained that he had become afraid of his client and could not be in the same room with him. The court naturally felt compelled to grant the dismissal and ordered appointment of counsel who could conduct the trial at the time set.

Treadwell expressed frustration and his concern that a series of ineffective counsel had denied him his right to a speedy trial. At the contentious hearing, Judge Campbell expressed his view of Treadwell's argument in light of the history of the proceedings. For example, Judge Campbell told Treadwell that his motions were all

---

**2.** Treadwell has not argued that the exclusion provisions of the Act, as applied to this case, work to violate his *Sixth Amendment* right to speedy trial.

part of a strategy to delay trial and invoke his speedy trial right, that the defendant was "playing games with me and trying to scam the system," asking for "an endless supply of lawyers," "repeatedly arguing the same things," and "abusing the public defender's office." At one point, Judge Campbell said: "I have had it, absolutely had it. I think you are trying to scam the system and trying to take advantage of me and the courts, and I want the record to reflect that based on these numerous hearings, your demeanor and deportment, you are trying to scam the system." At the subsequent recusal hearing, Judge Campbell recalled for the record the defendant's conduct at the dismissal-of-counsel hearing: "Treadwell was loud, was waving his hands, was hostile. He was nearly screaming. He was disrespectful. In fact, I had to tell him to sit down and be quiet."

A district judge is required to recuse himself " 'only if a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.' " *United States v. Story*, 716 F.2d 1088, 1091 (6th Cir.1983) (quoting *Trotter v. International Longshoremen's & Warehousemen's Union*, 704 F.2d 1141, 1144 (9th Cir.1983)). This standard is objective and is not based "on the subjective view of a party." *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir.1988). Prejudice or bias must be personal, or extrajudicial, in order to justify recusal. *See ibid.* This court has explained:

> "Personal" bias is prejudice that emanates from some source other than participation in the proceedings or prior contact with related cases. Personal bias arises out of the judge's background and associations. The critical test is whether the alleged bias "stem[s] from an extrajudicial source and result[s] in an opinion on the merits on some basis other than what the judge learned from his participation in the case."

*Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir.1989) (quoting *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir.1985), and *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

Treadwell concedes that under the standard heretofore followed in this circuit, recusal was properly denied. He presently asks this court to "except [his] case from the rule or modify the rule where statements on the record by the court so clearly demonstrate that a reasonable objective person would find bias or prejudice." Def. Br. at 40. To illustrate his point, Treadwell envisions the adverse reaction of a citizen who walked into court to hear a judge supplement the denial of a defendant's motion with commentary on the defendant's tactics. It is evident that Treadwell misunderstands the concepts of bias and *pre*judice. The latter term contemplates a jurist coming into court with preconceived notions of who ought to win or lose the case, and this court's § 455 jurisprudence adequately addresses that problem and public perceptions of it. Similarly, bias relates to a jurist upholding one side despite preponderantly meritorious arguments by the other, as a result of considerations not properly before the court. As Treadwell's concession necessarily recognizes, Judge Campbell's statements demonstrate no prejudice at all. Indeed, Judge Campbell was judging the merits of the case before him. Despite expressing frustration with what he viewed as the defendant's abusive tactics, Judge Campbell *granted* Treadwell's motion to appoint new counsel and abided by his wish for a prompt trial by declining to extend the case. This case involves neither bias nor prejudice. And we see no reason to create a new rule that would require recusal whenever a jurist makes statements that, taken out of context, might be misunderstood as something

vaguely akin to bias. Indeed, in this case, we see every reason to adhere to the rule reserving § 455 "prejudice" recusals for cases in which *extra* judicial factors influenced the proceedings.

### C

■ Treadwell moved for suppression of the statements he made to Agent Connor during the interview at the Metro Jail and the papers found among his effects during the search following the interview. At the beginning of the interview, the IRS agents advised the defendant, then in state custody on unrelated charges, of his *Miranda* rights. Treadwell indicated that he understood his rights and signed a written waiver. He verbally consented to a search of his prison property and signed another written consent form. According to Connor and another agent, Treadwell did not ask to speak with an attorney at any time. At the hearing on his suppression motion, the defendant claimed that he asked to speak with an attorney after the interview became "an accusatory type situation."

At the time of the interview, the defendant was under the care of a prison physician and taking the prescription anti-depressant Trazodone. He explained his use of the drug at the suppression hearing. He was supposed to take 75 mg. per evening to help him sleep. The 75 mg. dosage did not help him sleep, so he would periodically save his supply then take several hundred milligrams at once, which would make him "drowsy and a little incoherent, maybe submissive to someone sitting there talking to me." Another inmate testified to experiencing similar effects of Trazodone. Treadwell claimed to have been up all night playing dominoes with a cellmate the night before the IRS agents paid him a visit, leading him to take approximately 400 mg. of Trazodone around noon on the day of the interview, approximately ninety minutes before guards woke him to speak with the agents. Treadwell maintains that

his confession was not voluntary and that his consent to search "was given under circumstances demonstrating lack of a competent and voluntary waiver/consent." Def. Br. at 27–28.

The district court rejected the involuntary confession argument because Treadwell introduced no evidence of official coercion, and the court held that "impaired cognitive or volitional capacity" does not itself render a confession or consent to search involuntary. It similarly rejected the involuntary-consent-to-search-due-to-intoxication argument because Treadwell's claims of incoherence were inconsistent with his actions and demeanor during the search of his prison property, as recorded on a videotape introduced at the hearing. The court noted that the defendant's speech was not slurred, that he assisted in the examination of his property, discussed a number of things with multiple individuals, and answered questions responsively, maintaining his balance and presence of mind throughout. Finally, the court rejected his claim that he invoked the right to counsel during the interview after having earlier waived it because, after he supposedly asserted the right to counsel, he appeared on the videotape consenting to the search of his belongings without ever expressing "any kind of reluctance because he wants a lawyer." The court considered the defendant's and the agents' stake in the matter, along with Treadwell's felony record, and "resolve[d] the credibility determination against the defendant ...," finding that he had not, in fact, invoked his right to counsel.

A trial court's ruling on a motion to suppress is reviewed for clear error in factual findings but de novo as to questions of law. *See United States v. Dotson,* 49 F.3d 227, 229 (6th Cir.1995); *United States v. Roberts,* 986 F.2d 1026, 1029 (6th Cir. 1993). "We defer to the district court's

credibility determinations unless they have no foundation." *United States v. Owusu,* 199 F.3d 329, 338–39 (6th Cir.2000).

The district court's decision to credit the testimony of the agents and disbelieve the defendant's claim of having asserted the right to counsel has foundation in the record for the reasons given by the court. Therefore, we affirm the district court's ruling on the invocation-of-right-to-counsel claim.

Similarly, the district court's rejection of Treadwell's attack on his consent to search relied on a factual finding that the defendant was coherent at the time he waived his right to withhold consent. Since Treadwell does not claim clear error in that finding, this court has no reason to disturb the district court's conclusion.

Treadwell's involuntary confession claim relies on the due process clause of the Fifth Amendment. Waiver of *Miranda* rights must be voluntary, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception ... [and] made with full awareness both of the nature of the right to be abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The voluntary waiver of rights standard described in *Moran* tracks the voluntariness requirement of due process jurisprudence. This court has identified three conditions that must be present for a due process claim of involuntary confession to succeed.

Threshold to the determination that a confession was "involuntary" for due process purposes is the requirement that the police "extorted [the confession] from the accused by means of coercive activity." ... Once it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the "coercion" in question

was sufficient to overbear the will of the accused.... Finally, petitioner must prove that his will was overborne because of the coercive police activity in question. If the police misconduct at issue was not the "crucial motivating factor" behind petitioner's decision to confess, the confession may not be suppressed....

*McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.1988) (citations omitted); *cf. Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (a defendant, later diagnosed as suffering from a psychosis that interfered with his ability to make free and rational choices, approached a police officer and insisted on confessing to a murder; the Court held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman,* 889 F.2d 88, 94 (6th Cir.1989).

By his own testimony, Treadwell was responsible for taking an intoxicating medication in a dose more than five times that prescribed by state physicians. He introduced no evidence that the agents engaged in coercive activity of any sort or that they knew of his supposedly weakened mental state and chose to exploit it. For these reasons, his involuntary confession claim fails. The confession was properly obtained and evidence of it properly admitted at trial. Consequently, the evidence found during the consensual search that followed the confession-yielding interview was also properly introduced at trial.

## D

A reviewing court must accept the factual findings of a district court made in connection with sentencing unless they are clearly erroneous, and it must "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). As the Supreme Court explained, the "deference that is due depends on the nature of the question presented." *See Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Generally, this court adheres to the view that the question of "[w]hether the facts found by the district court warrant the application of a particular guideline provision is a legal question ... to be reviewed de novo by the appellate court." *United States v. Partington,* 21 F.3d 714, 717 (6th Cir.1994) (citing *United States v. Garner,* 940 F.2d 172, 174 (6th Cir.1991)). But the Supreme Court has recently indicated that some applications of the guidelines to undisputed facts deserve deferential review on appeal. For example, "[i]n light of the fact-bound nature of the legal decision [of whether prior convictions are related for purposes of the guidelines], the comparatively greater expertise of the District Court, and the limited value of uniform court of appeals precedent," courts of appeals should review deferentially a district court's determination of whether certain prior convictions were functionally consolidated, a component of the relatedness question. *Buford v. United States,* 532 U.S. 59, 121 S.Ct. 1276, 1281, 149 L.Ed.2d 197 (2001).

■ Treadwell argues that the district court erred in assessing the two-level organizer or leader enhancement of USSG § 3B1.1(c). As he did at trial, the defendant maintains that he was merely a participant in the false claims scheme and that his participation did not equal or exceed that of Mr. DeMoss. The Presentence Investigation Report (PSI) applied the enhancement, and the district court included the enhancement in calculating the adjusted offense level, citing *United States v. Cobleigh,* 75 F.3d 242, 251 (6th Cir.1996). Never in the course of the sentencing proceedings did the defendant object to application of the organizer/leader enhancement, so our review is limited to an examination for plain error. *See United States v. Kingsley,* 241 F.3d 828, 835–36 (6th Cir.2001) (explaining the plain error standard of review). On appeal, Treadwell has failed to identify a single fact in the record to support his assertion that the district court committed clear error in finding him an organizer or leader. The defendant's protestations of limited relative responsibility are insufficient in light of the vast amount of evidence pointing to his role as instigator and organizer of the false claims scheme. We detect no plain error on the record before us.

■ Treadwell also contends that the district court should have granted his request for a reduction in his offense level based on acceptance of responsibility, pursuant to USSG § 3E1.1(a). Among the considerations used in determining whether a defendant qualifies for this reduction are the defendant's "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." USSG § 3E1.1, comment. (n.1(a)). Except in "rare situations," the adjustment will not "apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt." USSG § 3E1.1, comment. (n.2). The trial court found that Treadwell "admitted only limited portions of the conduct comprising the offenses of conviction.... Specifically, Defendant has not admitted, and has even denied,

that he initiated and organized the scheme to file false claims for tax refunds and that he prepared certain false tax returns and tax documents." On appeal, Treadwell does not claim clear error in this finding. Instead, he seems to claim that his limited admission and his redirection of blame for filing certain returns onto Mr. DeMoss amount to acceptance of responsibility. They do not. Application note 1(a) makes truthfully admitting the conduct comprising the offense of conviction the primary factor in evaluating acceptance of responsibility. Treadwell has never admitted to engaging in the conduct underlying his conviction. The district court did not err in refusing to award the adjustment.

■ Next Treadwell objects to the district court's treating as "unrelated" certain prior convictions and sentences received on March 27, 1996, and listed in the PSI at ¶¶ 48–51. In his view, these four convictions (for aggravated assault, assault, stalking, and stalking, respectively) should be treated as related under USSG § 4A1.2(2). Treating the cases as related would reduce his criminal history score from 16 to 10, thereby moving him from Criminal History Category VI to Category V. Treadwell relies on the guidelines' rule that "... Otherwise, prior sentences are considered related if they resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common plan or scheme, or (C) were consolidated for trial or sentencing." USSG § 4A1.2, comment. (n.3). He distinguishes *United States v. Coleman*, 964 F.2d 564 (6th Cir. 1992) (affirming a district court's treatment of two prior sentences as unrelated because they had not been consolidated for sentencing and at all times were treated separately and distinctly), by pointing out that all four of his cases were charged in the same indictment and were, in his view, "treated as one" because they were consolidated for trial and involved the same victims. *But see* PSI at ¶ 49 (reporting the

names of the victims, which suggest that the victims of the second attack were not related to the victims of the others).

Treadwell conveniently overlooks the first sentence of application note 3, which provides: "Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (*i.e.*, the Defendant is arrested for the first offense prior to committing the second offense)." USSG § 4A1.2, comment. (n.3). This principle is the "otherwise" referred to by the sentence on which Treadwell relies. Treadwell was arrested for aggravated assault on April 4, 1995. He was arrested on the assault charge on April 14, 1995. The first stalking arrest was on May 5, 1995, and the second stalking arrest occurred on May 30, 1995. Although the PSI does not indicate the date the offenses were committed, the nature and circumstances of the crimes described in the PSI suggest that each was committed within close proximity to the date of arrest, meaning that each crime was separated by an intervening arrest. In overruling Treadwell's objections to the PSI, the district court specifically found that the crimes were separated by intervening arrest, relying in part on Treadwell's admission to that effect. On appeal, Treadwell does not claim that he committed all of the crimes prior to his initial arrest on April 4, 1995. He has, therefore, given us no reason to disturb the district court's findings and conclusions at to relatedness.

■ Finally, Treadwell argues that the district court should have granted him a downward departure due to allegedly harsh conditions of pre-trial confinement. A district court's refusal to depart downward is not reviewable on appeal as long as the court was aware of its authority to grant a discretionary departure. *See United States v. Ford*, 184 F.3d 566, 585 (6th Cir.1999). However, when a refusal

to depart downward is based on a conclusion that the court lacks authority to grant the departure request, the legal conclusion is reviewed de novo. *See United States v. Ebolum,* 72 F.3d 35, 37 (6th Cir.1995); *United States v. Byrd,* 53 F.3d 144, 145 (6th Cir.1995). The district court denied the motion for a downward departure, stating: "The Court finds that Defendant's conditions of pretrial confinement [are] unpleasant, but ... Defendant's conditions of confinement were not different, in type or degree, than those of the typical federal pretrial detainee. Accordingly, because the Defendant's conditions of confinement are not outside the 'heartland' of the Guidelines, the Motion for Downward Departure is denied. In any event, the Court declines to exercise its discretion to depart on this basis based on the record in this case." There can be no doubt that Judge Campbell was aware of his discretion and refused to exercise it in light of the facts before him. Treadwell's argument, therefore, is not cognizable on appeal.

### III

For the reasons stated above, we AFFIRM the judgment of conviction and sentence in all respects.